Jacques Arthur GUBBELS, Appellant,

v.

Richard C. HOY, as District Director, Immigration and Naturalization Service, Los Angeles, California, Appellee.

No. 15740.

United States Court of Appeals
Ninth Circuit.

Nov. 14, 1958.

Marshall E. Kidder, Los Angeles, Cal., Arthur J. Phelan, Milton T. Simmons, Phelan & Simmons, San Francisco, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Alfred B. Doutre, Richard A. Lavine, Jordan A. Dreifus, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before ORR, POPE and HAMLEY, Circuit Judges.

POPE, Circuit Judge.

After hearing before a special inquiry officer of the Immigration and Natural-

2. Dornblut prosecuted this appeal *in forma pauperis;* at the trial he was represented by counsel of his own selection.

ization Service, and rejection of his appeal by the Board of Immigration Appeals, appellant, an alien and native of Belgium, was ordered deported from the United States on the ground that he had after entry been convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct, within the meaning of § 241(a) (4) of the Immigration and Nationality Act of 1952 (8 U.S.C.A. § 1251(a) (4)).[1]

Plaintiff arrived in the United States with his parents on February 3, 1948 and was admitted for permanent residence. He was then 12 years of age. In 1952 he enlisted in the United States Army and on September 13, 1954, while serving in Germany with the American Armed Forces he was convicted of two offenses. The conviction by court-martial was for larceny committed on March 16, 1954 when he was charged with stealing a pistol, the property of the United States, of the value of more than $50; the second offense of which he was convicted, also by court-martial, was robbery on August 2, 1954. This charge was that by force and violence and against the will of the owner he stole an automobile of the value of more than $50. He was sentenced to confinement for five years and given a dishonorable discharge. After he was incarcer-

ated in a federal correctional institution he was paroled on September 29, 1956.

Appellant's appeal to the Board of Immigration Appeals was dismissed on June 12, 1956. On September 18, thereafter, he brought this action in the court below seeking a review of the order for his deportation and of the deportation proceedings, and praying for declaratory relief and an injunction against the district director. His case was heard upon a pretrial stipulation and order setting forth the foregoing facts and raising the question whether a conviction by court-martial is sufficient to sustain a deportation order under the statute mentioned.[2]

The provisions of the subsection under which appellant was ordered deported (footnote 1, supra), must be read in connection with subdivision (b) of the same section 241 (Title 8, § 1251(b)).[3] This provision, made specially applicable to subsection (a) (4), provides that the deportation shall not take place "if the court sentencing such alien for such crime shall make, at the time of first imposing judgment or passing sentence, or within thirty days thereafter, a recommendation * * * that such alien not be deported. * * *" Briefly stated, the general contention of the appellant is that when subsection (a) (4) is read in conjunction with subsection (b) (2) we

---

**1.** "§ 1251. Deportable Aliens—General Cases—(a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who— * * * (4) is convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more, or who at any time after entry is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether the convictions were in a single trial; * * *".

**2.** The pretrial order posed further questions as to whether a violation of Article 121 of the Uniform Code of Military Justice, 10 U.S.C.A. § 921 (Larceny) involved moral turpitude and whether there

was substantial evidence that the offenses of which appellant was convicted did not arise "out of a single scheme of criminal misconduct." They are not discussed in this opinion.

**3.** "(b) The provisions of subsection (a) (4) of this section respecting the deportation of an alien convicted of a crime or crimes shall not apply * * *

"(2) if the court sentencing such alien for such crime shall make, at the time of first imposing judgment or passing sentence, or within thirty days thereafter, a recommendation to the Attorney General that such alien not be deported, due notice having been given prior to making such recommendation to representatives of the interested State, the Service, and prosecution authorities, who shall be granted an opportunity to make representations in the matter."

must hold that it refers only to sentences imposed by ordinary criminal courts and that sentences imposed by military courts or courts-martial are not within the contemplation of this provision; that the act and the section here in question must be given a strict and narrow construction so that all doubts be resolved in favor of the person sought to be deported. He emphasizes the well known distinctions between military tribunals and other courts, some of which were noted in U. S. ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8, and says that from the nature of the case a court-martial is not in a position to act upon an application for recommendation of the kind referred to in subsection (b).

These contentions were rejected by the trial court which held that in respect to an officer or soldier the judgment of a court-martial has the same finality and conclusiveness which attends the judgments of a civil court in a case of which it takes cognizance. The court was of the view that the distinction between military tribunals and civil courts was well known to Congress which would have found no difficulty in excluding the convictions of the former if it had not intended for them to come within the meaning of the act. The court thought that the statute was unambiguous and that its plain language required a conclusion that convictions by courts-martial come within the meaning of the subsection here referred to.

Obviously the question here presented is a most difficult one. The point apparently has not been decided previously and we find nothing in the legislative history attending the enactment of this statutory provision which would tend to throw any light upon the intention of Congress in the use of the language in question. This appears to be one of those difficult cases in which so far as we can tell Congress did not have this sort of case in mind when the section was enacted. We are confronted with the problem discussed in Western Union Tel. Co. v. Lenroot, 323 U.S. 490, 508, 65 S.Ct. 335, 344, 89 L.Ed. 414, where the Court said: "Ascertain-

ment of the intention of Congress in this situation is impossible. It is to indulge in a fiction to say that it had a specific intention on a point whch never occurred to it." To use the language of that case we must (323 U.S. at page 501, 65 S.Ct. at page 341,) "take the Act as Congress gave it to us, without attempting to conform it to any notions of what Congress would have done if the circumstances of this case had been put before it."

It seems plain that the qualifying provisions of subsection (b) are an important part of the legislative scheme expressed in subsection (a) (4). While that section makes a conviction there referred to ground for deportation, it is qualified in an important manner by the provision of subsection (b) (2) that if the court sentencing the alien makes the recommendation mentioned, then the provisions of subsection (a) (4) do not apply. This extends to the alien an important right or privilege. No doubt in most cases counsel for a convicted alien would by motion call this provision to the attention of the court where the judgment was imposed. It also seems plain that if a military court is so constituted or its procedures are such as to make this privilege extended by subsection (b) (2) not readily available to a convicted alien, then it would be a fair conclusion that convictions in a military court were not contemplated by subsection (a) (4).

There are important respects in which court-martial prosecutions differ from those in a civil court. Thus in Reid v. Covert, 354 U.S. 1, 38, 77 S.Ct. 1222, 1241, 1 L.Ed.2d 1148, Justice Black, speaking for four members of the Court, in announcing the Court's decision said: "It must be emphasized that every person who comes within the jurisdiction of courts-martial is subject to military law —law that is substantially different from the law which governs civilian society. Military law is, in many respects, harsh law which is frequently cast in very sweeping and vague terms. It emphasizes the iron hand of discipline more than it does the even scales of justice." And he concluded by quoting from the

opinion of the Court in Toth v. Quarles, supra, as follows (354 U.S. at page 39, 77 S.Ct. at page 1242) : "[I]n summary, 'it still remains true that military tribunals have not been and probably never can be constituted in such way that they can have the same kind of quaifications that the Constitution has deemed essential to fair trials of civilians in federal courts'."

■ As suggested in Ex parte Quirin, 317 U.S. 1, 39, 63 S.Ct. 1, 87 L.Ed. 3, not all of the constitutional guarantees extended to defendants prosecuted in civil courts are available to an accused tried by a military tribunal.[4] Thus in any case other than capital, depositions may be used against the accused (Art. 49, Uniform Code of Military Justice, § 1, Title 50 U.S.C. § 624(d)[*]); sworn testimony taken in another proceeding may be introduced (Art. 50, Title 50 U.S.C. § 625[**]).

But what we think more significant about the procedure of a court-martial as it bears upon this problem is the fact, conceded by the Government, that a court-martial is an *ad hoc* body. Certainly in times of emergency an accused tried in Germany in one week may find two weeks later that of the five members of his general court-martial one may then be in Korea, another in Lebanon, a third in Formosa, a fourth in Japan and a fifth in the United States. In such a case, before the expiration of the thirty days provided in subsection (b) (2) the recommendation there referred to would have become a practical impossibility.

The briefs of the Government recognize this difficulty and suggest that the convening officer and the board of review, as reviewing authorities (Art. of War 59 to 66, Title 50 U.S.C. §§ 646 to 653)[†] are a part of the court-martial which have themselves sentencing power, and that the accused would therefore have a continuing opportunity to seek recommendation against his deportation within 30 days after the reviewing processes have been completed. As authority for this theory the Government cites Jackson v. Taylor, 353 U.S. 569, 77 S.Ct. 1027, 1032, 1 L.Ed.2d 1045, and Fowler v. Wilkinson, 353 U.S. 583, 77 S.Ct. 1035, 1 L.Ed.2d 1054.

It is true that in the Jackson case the Supreme Court cited with approval the statement of the chairman of the committee which drafted the Uniform Code in which it was said respecting the board of review that "It may review law, facts, and practically, sentences." The Court upheld the power of the board of review in that case to alter a sentence which may have amounted in substance to the imposition of a sentence. Similar indications may be found in the Fowler case, supra.

We cannot think that the power to make a recommendation against deportation within 30 days of "first imposing judgment or passing sentence" could be intended to apply to the convening officer or the board of review when acting in review of a court-martial. The action of such officials is necessarily based solely upon the written record of the trial. Title 50 U.S.C. §§ 647, 653(b). We think it plain that the reason subsection (b) (2) gave authority to make the recommendation to the "court * * * sentencing such alien" was that in the cases which Congress must have had in mind the court which sentenced the alien would be represented by the judge who tried the case, and who had the best opportunity to observe the alien and to judge from what transpired during the trial whether the circumstances of his offense and his general character and attitude were such as to justify the making of such a recommendation. Surely no convening officer or board of review, working from a cold record, would have a similar opportunity to reach a

4. Cf. Reid v. Covert, supra, 354 U.S. at p. 37, 77 S.Ct. 1222, 1 L.Ed.2d 1148, footnote 68.

* Now 10 U.S.C.A. § 849(d).

** Now 10 U.S.C.A. § 850.

† Now 10 U.S.C.A. §§ 859–866.

conclusion as to whether such a recommendation should be made.

 It is plain therefore that court-martial procedures are not well adapted to the practical working of the procedures contemplated by subsection (b) (2).[5] With that in mind and considering the doubts which arise therefrom, we think that we must follow the suggestion made in the court's decision in Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433, "We resolve the doubts in favor of that construction because deportation is a drastic measure and at times the equivalent of banishment or exile, Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10 [92 L.Ed. 17]. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used."

Resolving the doubts against the contention that the sentence of a court-martial may be a basis for deportation under subsection (a) (4), we hold that the judgment of the court below must be reversed and the cause is remanded with directions to vacate and set aside the order of deportation.

---

5. If anything, the history of these provisions tends to emphasize this point. The language of subsection (b) (2) was adopted from what was originally § 19 of the Immigration Act of 1917, c. 29, 39 Stat. 889. As then enacted, its provision for notice was that "due notice" be given to "representatives of the State", and the recommendation was to the Secretary of Labor. The corresponding Act of 1940, c. 439, Title II, § 20, 54 Stat. 671, was worded in the same manner, except that the recommendation was to the Attorney General. In 1917 and 1940 military court procedure had even less resemblance to that of ordinary courts than it had after the enactment of the Uniform Code of Military Justice in 1950. Thus in 1917 the accused might well have been represented by defense counsel not learned in the law, who would be most unlikely to know about, or how to take advantage of the provision for court recommendation concerning deportation. (Under the present code defense counsel must be law-trained. Title 50, § 591(b), now 10 U.S.C.A. § 827(b)).

Again, the 1917 and 1940 texts provided for "due notice" to the "State" indicating that state convictions were what Congress had in mind. While the present text calls for due notice to representatives of "the interested State, the Service, and prosecution authorities", the addition of the words "prosecution authorities" are hardly an apt description of the military authorities. Nothing in the 1952 Act suggests any enlargement of the scope of the word "court" as used in the 1917 Act.