## COSTELLO *v.* IMMIGRATION AND NATURALIZATION SERVICE.

No. 83.  Argued December 12, 1963.—Decided February 17, 1964.

*Edward Bennett Williams* argued the cause for petitioner.  With him on the briefs was *Harold Ungar*.

*Wayne G. Barnett* argued the cause for respondent.  With him on the brief were *Solicitor General Cox, Assistant Attorney General Miller, Stephen J. Pollak* and *Beatrice Rosenberg*.

MR. JUSTICE STEWART delivered the opinion of the Court.

Section 241 (a)(4) of the Immigration and Nationality Act of 1952 provides that "Any alien in the United States . . . shall, upon the order of the Attorney General, be deported who . . . at any time after entry is convicted of two crimes involving moral turpitude . . . ." [1] The single question to be decided in the present case is whether this provision applies to a person who was a naturalized citizen at the time he was convicted of the crimes, but was later denaturalized.

The petitioner, born in Italy in 1891, was brought to the United States when he was four years old and has lived here ever since. He became a naturalized citizen in 1925. In 1954 he was convicted of two separate offenses of income tax evasion, and the convictions were ultimately affirmed by this Court. *Costello* v. *United States,* 350 U. S. 359. In 1959 his citizenship was revoked and his certificate of naturalization canceled on the ground that his citizenship had been acquired by willful misrepresentation. This Court affirmed the judgment of denaturalization. *Costello* v. *United States,* 365 U. S. 265.

In 1961 the Immigration and Naturalization Service commenced proceedings to deport the petitioner under § 241 (a)(4), and it is those proceedings which have cul-

---

[1] "(a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—

. . . . .

"(4) is convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more, or who at any time after entry is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial;" 66 Stat. 204, as amended, 8 U. S. C. § 1251 (a)(4).

minated in the case now before us. The Special Inquiry Officer found the petitioner deportable; the Board of Immigration Appeals affirmed; and the Court of Appeals dismissed the petition for review, holding that the petitioner was subject to deportation under § 241 (a)(4) even though the two convictions relied upon to support deportation both occurred at a time when he was a naturalized citizen. 311 F. 2d 343. We granted certiorari to consider an important question of federal law.[2] For the reasons which follow, we reverse the judgment of the Court of Appeals.

At a semantic level, the controversy centers around the use of the present tense "is" in the clause "[[a]ny alien] who at any time after entry *is* convicted . . . ." The petitioner argues that this language permits deportation only of one who was an alien at the time of his convictions. The Court of Appeals totally rejected such a contention, holding that this statutory language, considered along with the phrase "at any time after entry" and with the broad legislative history, clearly permits deportation of a person now an alien who was convicted of the two crimes in question while he was a naturalized citizen. "There is no ambiguity," the court wrote, and "no room for interpretation or construction." 311 F. 2d, at 345. The court found additional support for its conclusion in *Eichenlaub* v. *Shaughnessy*, 338 U. S. 521, a case which held that under a 1920 deportation law aliens who had been convicted of specified offenses were deportable even though the convictions had occurred at a time when the aliens held certificates of naturalization.

---

[2] The grant of certiorari was "limited to Question 1 presented by the petition which reads as follows:

" 'Whether the provision of § 241 (a)(4) of the Immigration and Nationality Act of 1952 for deportation of an "alien . . . who at any time after entry is convicted of two crimes" applies to an individual who was a naturalized citizen when convicted.' " 372 U. S. 975.

We take a different view. The statute construed in *Eichenlaub* differs from § 241 (a)(4) in several important respects. The law there involved was the Act of May 10, 1920, which provided that "All aliens who since August 1, 1914, have been or may hereafter be convicted" of violations of the Espionage Act of 1917, as amended, were to be deported, provided the Secretary of Labor after a hearing found them to be undesirable residents of the United States.[3] The Court read this language as unambiguously authorizing deportation; regardless of the aliens' status at the time they were convicted. It is evident from what was said in the opinion that the Court was aided considerably in its search for the proper construction of the statute by Congress' use of the past tense in the phrase "have been or may hereafter be," and the fact that the only limitation which Congress placed upon the time of conviction was that it be "since August 1, 1914."[4] The

[3] The relevant paragraphs of the Act of May 10, 1920, read as follows:

". . . That aliens of the following classes, in addition to those for whose expulsion from the United States provision is made in the existing law, shall, upon the warrant of the Secretary of Labor, be taken into his custody and deported . . . if the Secretary of Labor, after hearing, finds that such aliens are undesirable residents of the United States, to wit:

"(1) All aliens who are now interned under section 4067 of the Revised Statutes . . . .

"(2) All aliens who since August 1, 1914, have been or may hereafter be convicted of any violation or conspiracy to violate any of the following Acts . . . namely:

"(a) An Act entitled 'An Act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws . . . .'" 41 Stat. 593–594. See 8 U. S. C. § 157 (1926 ed.).

[4] "The proper scope of the Act of 1920 as applied to these cases is found in the ordinary meaning of its words." 338 U. S., at 527. "The statutory language which says that 'aliens who since August 1, 1914, *have been or may hereafter be convicted . . .*' (emphasis sup-

Court also found specific legislative history to support its conclusion. As the Congressional Committee Reports demonstrated, the 1920 law was a special statute dealing with sabotage and espionage, originally enacted in order to deport "some or all of about 500 aliens who were then interned as dangerous enemy aliens and who might be found, after hearings, to be undesirable residents, and also to deport some or all of about 150 other aliens who, during World War I, had been convicted of violations of the Espionage Act or other national security measures, and who might be found, after hearings, to be undesirable residents." 338 U. S., at 532. The Court therefore concluded that Congress, when it enacted the statute, had expressed a clear intent to group together denaturalized citizens along with aliens who had never acquired citizenship and to deport them for specific crimes involving national security occurring after a specific date at the beginning of World War I.

Neither the language nor the history of § 241 (a)(4) lends itself so easily to a similar construction. The subsection employs neither a past tense verb nor a single specific time limitation. The petitioner's construction—that the language permits deportation only of a person who was an alien at the time of his convictions, and the Court of Appeals' construction—that the language permits deportation of a person now an alien who at any time after entry has been convicted of two crimes, regardless of his status at the time of the convictions—are both possible readings of the statute, as the respondent has conceded in brief and oral argument.

---

plied) refers to the requirement that the deportations be applicable to all persons who had been convicted of certain enumerated offenses since about the beginning of World War I (August 1, 1914), whether those convictions were had before or after May 10, 1920." 338 U. S., at 530.

We agree with the Court of Appeals that the tense of the verb "be" is not, considered alone, dispositive.[5] On the other hand, we disagree with that court's reliance on the phrase "at any time after entry" in § 241 (a)(4) to support the conclusion that an alien is deportable for post-entry conduct whether or not he was an alien at the time of conviction. Since § 212 (a)(9)[6] provides for the *exclusion* of aliens convicted of crimes of moral turpitude, and any excludable alien who nevertheless enters the country is deportable under § 241 (a)(1),[7] it seems just as logical to conclude that the purpose of the phrase "at any time after entry" in § 241 (a)(4) was simply to make clear that § 241 (a)(4) authorizes the deportation of aliens who were not originally excludable, but were convicted after entry.

There is nothing in the legislative history of § 241 (a)(4) of so specific a nature as to resolve the ambiguity of the statutory language. The general legislative purpose underlying enactment of § 241 (a)(4) was to broaden the provisions governing deportation, "particularly those referring to criminal and subversive aliens."[8] But refer-

---

[5] Comparing the "is" of § 241 (a)(4) with the various forms of "be" employed in other subsections of § 241 (a) is hardly helpful. It is as likely that the differences in wording found in these subsections reflect differences in style attributable to the various antecedents of the several provisions, as it is that the use of the present tense in § 241 (a)(4) reflects a specific congressional intent that that particular subsection, in contrast to the others, was not to be applied to people in the petitioner's position.

[6] 8 U. S. C. § 1182 (a)(9).

[7] 8 U. S. C. § 1251 (a)(1).

[8] See Commentary on the Immigration and Nationality Act, Walter M. Besterman, Legislative Assistant to the House Committee on the Judiciary, 8 U. S. C. A., pt. I, p. 61. This commentator makes no reference to the problem before us, although he does refer to several innovations in the Act broadening its scope: "Many of the grounds

ence to such a generalized purpose does little to pro-
mote resolution of the specific problem before us, of
which there was absolutely no mention in the Com-
mittee Reports or other legislative materials concerning
§ 241 (a)(4).[9]

Although no legislative history illumines our problem,
considerable light is forthcoming from another provision
of the statute itself. Section 241 (b)(2), made specifi-
cally applicable to § 241 (a)(4), provides that deporta-
tion shall not take place "if the court sentencing such
alien for such crime shall make, at the time of first im-
posing judgment or passing sentence, or within thirty
days thereafter, a recommendation . . . that such alien
not be deported." [10]   As another court has correctly ob-

---

for deportation specified in the new law are retroactive in effect.
They apply to the alien notwithstanding the fact that he may have
entered the United States prior to the enactment of the 1952 law.
Also, he may be found now to be deportable by reason of facts which
occurred prior to the enactment of this Act [June 27, 1952]."
Besterman, *ibid.*

[9] See H. R. Rep. No. 1365, 82d Cong., 2d Sess., 60 (1952); S. Rep.
No. 1515, 81st Cong., 2d Sess., 390–392 (1950); S. Rep. No. 1137,
82d Cong., 2d Sess., 21 (1952); H. R. Rep. No. 2096 (Conference
Report), 82d Cong., 2d Sess., 127 (1952). See also Immigration and
Naturalization Service, Analysis of S. 3455, 81st Cong., 2d Sess.
(1950), Vol. 5, pp. 241–3 through 241–6; and Analysis of S. 716,
82d Cong., 1st Sess. (1951), Vol. 4, pp. 241–2 through 241–4. See
generally, Besterman, note 8, *supra,* pp. 1–91.

[10] "The provisions of subsection (a)(4) of this section respecting
the deportation of an alien convicted of a crime or crimes shall not
apply . . . (2) if the court sentencing such alien for such crime shall
make, at the time of first imposing judgment or passing sentence, or
within thirty days thereafter, a recommendation to the Attorney
General that such alien not be deported, due notice having been given
prior to making such recommendation to representatives of the inter-
ested State, the Service, and prosecution authorities, who shall be
granted an opportunity to make representations in the matter."
8 U. S. C. § 1251 (b).

served, "It seems plain that the qualifying provisions of subsection (b) are an important part of the legislative scheme expressed in subsection (a) (4). While that section makes a conviction there referred to ground for deportation, it is qualified in an important manner by the provision of subsection (b) (2) that if the court sentencing the alien makes the recommendation mentioned, then the provisions of subsection (a) (4) do not apply." *Gubbels* v. *Hoy,* 261 F. 2d 952, 954.[11]

Yet if § 241 (a)(4) were construed to apply to those convicted when they were naturalized citizens, the protective provisions of § 241 (b)(2) would, as to them, become a dead letter. A naturalized citizen would not "at the time of first imposing judgment or passing sentence," or presumably "within thirty days thereafter," be an "alien" who could seek to invoke the protections of this section of the law. Until denaturalized, he would still be a citizen for all purposes, and a sentencing court would lack jurisdiction to make the recommendation provided by § 241 (b)(2).[12] We would hesitate long before adopting a construction of § 241 (a)(4) which would, with respect to an entire class of aliens, completely nul-

---

[11] In *Gubbels* the Court of Appeals for the Ninth Circuit held that court-martial convictions could not provide a basis for deportation under § 241 (a)(4) because a military court is not so constituted as to make the privilege accorded by § 241 (b)(2) available to a convicted alien.

[12] It has been suggested that the petitioner, or one similarly situated, was at the time of the conviction chargeable with knowledge that he had procured his naturalization illegally, and that he could have therefore proceeded to seek a recommendation from the sentencing judge under § 241 (b)(2). This suggestion seems not only practically unrealistic, but technically untenable. It has been held that only a competent court in appropriate proceedings can nullify a status of naturalized citizenship. *United States* v. *Stephan,* 50 F. Supp. 445.

lify a procedure so intrinsic a part of the legislative scheme.[13]

If, however, despite the impact of § 241 (b)(2), it should still be thought that the language of § 241 (a)(4) itself and the absence of legislative history continued to leave the matter in some doubt, we would nonetheless be constrained by accepted principles of statutory construction in this area of the law to resolve that doubt in favor of the petitioner. As the Court has emphasized, "deportation is a drastic measure and at times the equivalent of banishment or exile, *Delgadillo* v. *Carmichael,* 332 U. S. 388. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used." *Fong Haw Tan* v. *Phelan,* 333 U. S. 6, 10.

Adoption of the petitioner's construction of § 241 (a)(4) does not end our inquiry, however, for the respondent urges affirmance of the finding of deportability on an alternative ground, not reached by the Court of Appeals. The argument is that the petitioner is deportable because § 340 (a) of the Immigration and Nationality Act of 1952, under which the petitioner's citizenship was canceled, provides that an order of denaturalization "shall be effective as of the original date" of the naturalization

---

[13] The *Eichenlaub* statute carried with it no such qualifying provision, which reinforces the conclusion that the decision in *Eichenlaub* is of no basic relevance to the issue here. See note 3, *supra.* Section 19 of the Immigration Act of 1917, 39 Stat. 874, the predecessor of § 241 (a)(4), on the other hand, did contain a relief provision similar to § 241 (b)(2). See 39 Stat. 889–890.

order.[14]    Under this so-called "relation-back" theory, it is said that cancellation of the petitioner's certificate of naturalization was "effective" as of 1925, the year of his original naturalization, that he was therefore an alien as a matter of law at the time of his convictions in 1954, and that he is accordingly deportable under § 241 (a)(4) even if that provision requires alienage at the time of the convictions.

We reject this theory for much the same reasons which have prompted our construction of § 241 (a)(4).    There is nothing in the language of § 340 (a), and not a single indication in the copious legislative history of the 1952 Act, to suggest that Congress intended the relation-back language of § 340 (a) to apply to the general deportation provisions of the Act.    In view of the complete absence of any indication to the contrary, it would appear that in adopting the relation-back language of § 340 (a) Congress intended to do no more than to codify existing case law.    Several cases before 1952 had held that an order of denaturalization made the original naturalization a nullity, *Johannessen* v. *United States*, 225 U. S. 227, and that, for the purpose of determining rights of derivative citizenship, denaturalization related back to the date of naturalization.    *Battaglino* v. *Marshall*, 172 F. 2d 979, 981; *Rosenberg* v. *United States*, 60 F. 2d 475.

The Second Circuit was alone among the federal courts in thinking that this *nunc pro tunc* concept which had

---

[14] "It shall be the duty of the United States district attorneys for the respective districts . . . to institute proceedings . . . for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization . . . , and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively . . . ."    66 Stat. 260, 8 U. S. C. § 1451 (a).

been judicially developed in the denaturalization cases could properly be related to the task of construing a deportation statute. *Eichenlaub* v. *Watkins,* 167 F. 2d 659; *Willumeit* v. *Watkins,* 171 F. 2d 773. And when those cases came here, this Court pointedly declined to adopt the Second Circuit's reasoning. *Eichenlaub* v. *Shaughnessy,* 338 U. S. 521, 529–530.[15] Following this Court's decision in *Eichenlaub,* the Sixth Circuit expressly refused to apply to a general deportation statute the relation-back principle of the denaturalization cases, in determining when there had been an "entry" for purposes of the predecessor of § 241 (a)(4) in the 1917 Act. *Brancato* v. *Lehmann,* 239 F. 2d 663.[16]

The relation-back concept is a legal fiction at best, and even the respondent concedes that it cannot be "mechanically applied." With respect to denaturalization itself, Congress clearly adopted the concept in enacting § 340 (a). But in the absence of specific legislative history to the contrary, we are unwilling to attribute to Congress a purpose to extend this fiction to the deportation provisions of § 241 (a)(4). This Court declined to apply the fiction in a deportation context in the *Eichenlaub* case, and we decline to do so now.

The argument is made that it is anomalous to hold that a person found to have procured his naturalization by willful misrepresentation is not subject to deportation,

---

[15] The companion case, *Willumeit* v. *Shaughnessy,* was decided in the same opinion. 338 U. S. 521.

[16] Brancato first entered the United States in 1914; he was naturalized in 1929; he then left the United States and returned in 1930; he was convicted of a crime involving moral turpitude in 1932; he was denaturalized in 1939. The question was whether his conviction in 1932 was within five years after an "entry," as defined by the statute. The Court of Appeals held that the cancellation of his citizenship in 1939 related back to 1929 for purposes of denaturalization, but not for purposes of the deportation statute, and that his return to the United States in 1930 was therefore not an "entry" in that year.

although he would be deportable if he had never been naturalized at all. But it is not at all certain that this petitioner *would* be deportable today if he had never acquired naturalized citizenship. The petitioner points out that if he had held alienage status at the time of his trial for income tax evasion, he could have offered to plead guilty to one count of the indictment in return for a *nolle prosequi* of the other counts, and that conviction on but one count would not have made him subject to deportation under § 241 (a)(4). Even more important, had petitioner been an alien at the time of his convictions, he could have availed himself of the supplementary relief procedure provided for in § 241 (b)(2). In other words, to hold that under the relation-back language of § 340 (a) the petitioner was an "alien" at the time of his convictions would go much further than merely preventing him from benefiting from his invalid naturalization; it would put him in a much more disadvantageous position than he would have occupied if he had never acquired a naturalization certificate at all.

Moreover, if the relation-back doctrine were applicable in this case, it would be applicable as well, as the respondent's counsel conceded in oral argument, in the case of one whose original naturalization was not fraudulent, but simply legally invalid upon some technical ground.[17] In this area of the law, involving as it may the equivalent of banishment or exile, we do well to eschew technicalities and fictions and to deal instead with realities. The reality is that the petitioner's convictions occurred when he

---

[17] Section 340 (a) was amended in 1961 to provide for cancellation of citizenship on the ground that it was "illegally procured." Act of September 26, 1961, § 18, 75 Stat. 656. In *Brancato* v. *Lehmann*, 239 F. 2d 663, the appellant's citizenship had been canceled because his original petition for naturalization "was not verified by the affidavits of two credible witnesses," as required by the 1906 Act.

was a naturalized citizen, as he had been for almost 30 years.

If Congress had wanted the relation-back doctrine of § 340 (a) to apply to the deportation provisions of § 241 (a)(4), and thus to render nugatory and meaningless for an entire class of aliens the protections of § 241 (b)(2), Congress could easily have said so. But there is no evidence whatever that the question was even considered. If and when Congress gives thought to the matter, it might well draw distinctions based upon the ground for denaturalization, the nature of the criminal convictions, and the time interval between naturalization and conviction, or between conviction and denaturalization.[18] But such differentiations are not for this Court to make.

*Reversed.*

Mr. Justice Harlan took no part in the consideration or decision of this case.

Mr. Justice White, with whom Mr. Justice Clark concurs, dissenting.

It has not been contended, and the majority does not now hold, that there is a constitutional impediment to the deportation of an alien who is convicted of the commission of two crimes involving moral turpitude, regardless of his citizenship status at the time the crimes were committed. The question in this case is whether §§ 241 and 340 of the Immigration and Nationality Act of 1952 manifest a congressional intent to achieve such a result. I find the Court's decision inconsistent with the language of the statute, with its history and background, and with any reasonable purpose which can be ascribed to Congress in enacting it.

---

[18] See Mr. Justice Frankfurter's dissenting opinion in *Eichenlaub* v. *Shaughnessy*, 338 U. S., at 533, 536–537.

## I.

Petitioner, born in Italy, entered the United States as an alien in 1895, and in 1925 became a naturalized citizen of this country. In 1954 he was convicted on two separate counts of having attempted to defeat and evade the payment of income taxes by filing false and fraudulent returns for the years 1948 and 1949. The convictions were affirmed by this Court. *Costello* v. *United States,* 350 U. S. 359. In 1959 his certificate of naturalization was canceled on the ground that it had been procured by willful misrepresentation, and this judgment was also affirmed. *Costello* v. *United States,* 365 U. S. 265. The United States has now brought deportation proceedings under § 241 (a)(4) of the Immigration and Nationality Act of 1952, which provides that:

> "Any alien in the United States . . . shall . . . be deported . . . who at any time after entry is convicted of two crimes involving moral turpitude . . . ."

This description of the deportable alien fits Costello exactly and unambiguously. He is an alien now and was an alien at the time of entry, an alien who "at any time after entry is convicted of two crimes . . . ." The all-embracing language of the section recognizes no exception based upon the time the crimes were committed.

The qualification which the Court carves out of § 241 (a)(4), requiring that the convictions occur at a time when an alien is not a citizen, is not found in the statute itself and can be achieved only at the expense of the purpose of the statute which is clearly evident from its terms and history and which should control its construction if the Court is not to stray from its judicial function.[1]

---

[1] This Court has repeatedly stressed the principle that in construing statutes "the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay

Pursuant to its power, unquestioned here, to prescribe the conditions for continued alien presence in this country, Congress has enacted § 241 (a) which embodies a determination that certain classes of aliens, by reason of their acts and conduct, are no longer desirable residents of this country. The significance of the provision in § 241 (a)(4) dealing with aliens who, any time after entry, commit two crimes involving moral turpitude is that in Congress' judgment the commission of two such crimes is indicative of a confirmed criminal type from whom the privilege of remaining in this country is to be withdrawn. The House Committee which recommended the predecessor to § 241 (a)(4) in § 19 of the Immigration Act of 1917 agreed unanimously that "those who committed a second crime involving moral turpitude showed then a criminal heart and a criminal tendency, and they should be deported." 53 Cong. Rec. 5168. It is not for us to reassess the wisdom of this congressional judgment, which was reaffirmed in the 1952 Act. The function of the dual conviction standard being to identify those individuals who are presumed to possess lawless propensities and who are therefore undesirable, the circumstance of nominal citizenship status at the time of conviction is beside the point.

In certain respects § 241 (a) redefined the criteria for deportability. Under subsection (d), § 241 was to be applied to an alien even though the conduct which placed him within a deportable class took place prior to the enactment of the section and even though that conduct would not have forfeited residential privileges under the previous law. This was the holding of the Court in *Lehmann* v. *Carson*, 353 U. S. 685, where an alien was

down." *United States* v. *Whitridge*, 197 U. S. 135, 143. See *United States* v. *Shirey*, 359 U. S. 255, 260–261; *United States* v. *CIO*, 335 U. S. 106, 112; *United States* v. *American Trucking Assns.*, 310 U. S. 534, 543; *Ozawa* v. *United States*, 260 U. S. 178, 194.

held deportable under the 1952 Act for the prior commission of two crimes although under the former law a conditional pardon given for one of them would have saved the alien from deportation. Given *Lehmann* v. *Carson* and like cases upholding the power of Congress to legislate in this manner,[2] the legislative intention to provide current standards for deportability is not to be frustrated by importing irrelevant considerations such as the previous state of the law or the fact of technical citizenship at the time the crimes were committed. Neither bears upon the question of whether the alien's past conduct brings him within the present definition of the deportable alien.

Costello is an alien now, and his criminal propensities remain the same even though the crimes for which he has been convicted were committed while he was a nominal citizen. Nor is his present undesirability diminished by the fact that his citizenship upon which he relies was obtained by fraud and at a time when the law, as it has since 1917, provided for deportation upon the commission of two crimes involving moral turpitude.

Today's holding has an anomalous result. The alien who has not become a citizen is deportable for the commission of two crimes. But not so the alien who has committed two crimes and has also been denaturalized for fraud practiced in procuring his citizenship.[3] His fraud becomes his ready and effective shield, a result which I cannot believe Congress intended to enact into law.

---

[2] *Marcello* v. *Bonds,* 349 U. S. 302; *Galvan* v. *Press,* 347 U. S. 522; *Harisiades* v. *Shaughnessy,* 342 U. S. 580; *Mahler* v. *Eby,* 264 U. S. 32; *Ng Fung Ho* v. *White,* 259 U. S. 276; *Bugajewitz* v. *Adams,* 228 U. S. 585.

[3] The Court points out that there may be cases in which this anomaly will not result. This observation does not alter the fact that it does exist in this case, and will exist in all cases where the revocation of the naturalization certificate is for fraudulent conduct.

## II.

The foregoing interpretation of § 241 (a)(4) is fortified by an examination of the background against which it was enacted.   The same issue that is presented by the instant case was resolved by this Court in 1950, a little over two years before the final passage of the 1952 Immigration and Nationality Act, in *Eichenlaub* v. *Shaughnessy* and its companion case *Willumeit* v. *Shaughnessy,* 338 U. S. 521.   Eichenlaub and Willumeit were both born in Germany and entered this country in 1930 and 1925, respectively.   In the 1930's they were naturalized, but their naturalization certificates were canceled for fraud in 1944.   In 1941 and 1942, during the time they enjoyed citizenship status, they had been convicted of violations of the Espionage Act of 1917.   The question was whether they were deportable under the Act of May 10, 1920, which declared deportable as undesirable residents:

> "All aliens who since August 1, 1914, have been or may hereafter be convicted of any violation [of the Espionage Act, among others]."

As in the instant case Eichenlaub and Willumeit argued that deportability is conditioned on alienage status at the time of conviction.[4]   This Court's answer to that contention was:

> "If the Act of 1920 had been intended to initiate the distinction here urged by the relators, it is likely that the change would have been made by express provision for it.   We find nothing in its legislative

---

[4] Dr. Willumeit contended that: "The language shows that the alien must be an 'alien' at the time that he 'may . . . be convicted.' The use of the words 'aliens who may *be*' convicted indicates that the alien must '*be*' an alien at the time of conviction.   There is no other grammatical possibility." Brief for the Petitioner, *Willumeit v. Shaughnessy,* No. 82, October Term, 1949, p. 7.

history that suggests a congressional intent to distinguish between two such groups of undesirable criminals." 338 U. S., at 532.

Willumeit argued that since the Act of 1920 was occasioned by a desire to rid the country of two specific groups of enemy aliens not deportable under then existing statutes, it should be narrowly interpreted. The Court agreed as to the purpose of the Act but reached a different conclusion as to the principle of statutory interpretation which followed therefrom:

"It is hardly conceivable that, under those circumstances, Congress, without expressly saying so, intended to prevent . . . [the deportation of] alien offenders merely because they had received their respective convictions at times when they held certificates of naturalization, later canceled for fraud. To do so would permit the denaturalized aliens to set up a canceled fraudulent status as a defense, and successfully to claim benefits and advantages under it. Congress, in 1920, evidently wanted to provide a means by which to free the United States of residents who (1) had been or thereafter were convicted of certain offenses against the security of the United States, (2) had been or thereafter were found, after hearing, to be undesirable residents of the United States, and (3) being aliens were subject to deportation. Congress said just that." *Id.*, at 532–533.

The *Eichenlaub* case, decided at the time the 1952 Act was under consideration, carried the clear message that the courts would not impute to the legislature an intent to favor twice-convicted aliens whose citizenship has been canceled for fraud over those who never held citizenship status and that Congress must say so if it intended to create a distinction based on citizenship status at the time of conviction for crimes on which deportation proceedings

might be based.  In the face of this message Congress proceeded to enact § 241 (a)(4) declaring that "Any alien . . . shall . . . be deported . . . who at any time after entry is convicted of two crimes involving moral turpitude." [5]  Even if as a matter of abstract argument about the meaning of these words the majority's opinion is defensible, which I do not think it is, it fails completely as a matter of interpretation of this statute in the context of its enactment.

The petitioner contends that *Eichenlaub* is distinguishable on the ground that the statute in that case applied to aliens who "have been or may hereafter be" convicted, whereas § 241 (a)(4) refers to any alien who "is" convicted.  His argument is that by use of dual verbs the statute in *Eichenlaub* explicitly referred to two groups of aliens, those who were and those who were not citizens when convicted.  In his view, therefore, the decision in *Eichenlaub* must have rested upon the "have been" leg of the statute.  But both the majority and the dissent in *Eichenlaub* recognized that the use of past and present verbs in the 1920 Act was necessary because that Act provided for two definite periods of time—between August 1,

---

[5] The subcommittees of the House and Senate Judiciary Committees were aware of the *Eichenlaub* decision and of its bearing on § 241 (a)(4) of the pending statute.  In answer to the objection that certain provisions of the proposed statute were *ex post facto* and therefore unconstitutional, Mr. Richard Arens, Staff Director of the Senate Subcommittee on S. 716 stated:

"What do you mean by ex post facto legislation?  Does not the term 'ex post facto' by its historical origin and by the pronouncements of the Court in such cases as *Eichenlaub* v. *Shaughnessy* and these other cases, including the Eby case to which we alluded a few moments ago, establish beyond peradventure of doubt that that ex post facto has no applicability to an immigration procedure?"

Joint Hearings before the Subcommittees of the Committees on the Judiciary, Congress of the United States, 82d Cong., 1st Sess., on S. 716, H. R. 2379, and H. R. 2816, at 694.

1914, and May 10, 1920; and after 1920—in which the convictions might occur.[6] The coalescence of two verbs was thus unrelated to citizenship status at the time of conviction.[7]

## III.

Whatever doubt as to congressional intent the majority may have after examining § 241 (a) standing alone should be dispelled by § 340 (a) of the Immigration and Nationality Act, which provides that revocation of a naturalization certificate relates back to, and is deemed

---

[6] The opinion of the Court observed: "The statutory language which says that 'aliens who since August 1, 1914, *have been or may hereafter be convicted . . .*' refers to the requirement that the deportations be applicable to all persons who had been convicted of certain enumerated offenses since about the beginning of World War I (August 1, 1914), whether those convictions were had before or after May 10, 1920." 338 U. S., at 530.

And the dissent states: "The Act of May 10, 1920, provides that 'All aliens who since August 1, 1914, have been or may hereafter be convicted' of certain offenses shall be deported upon a finding that they are 'undesirable residents of the United States.' *Since neither of the petitioners herein was found to 'have been' convicted of any offense before passage of the Act, they come, it is urged, within the alternative prerequisite.*" 338 U. S., at 534. (Emphasis added.)

[7] Petitioner also argues that the absence of a "has been" provision in § 241 (a) (4) is significant because of the fact that most of the other grounds for deportation based on past conduct are stated in the alternative perfect and indicative verb forms: "is or has been," or "is or shall have been." In petitioner's view the reason for this distinction is that under the "is or has been" paragraphs, citizenship status at the time of the act or event is irrelevant, but the "is" language of paragraph (4) authorizes deportation only if alienage status and the basis for deportability coincide in time. This dichotomy of deportability tests would mean that a denaturalized alien could be deported for being convicted of carrying a sawed-off shotgun, or being connected with the management of a house of prostitution during the time he was a citizen, but not for two convictions of crimes involving moral turpitude. The absurdity of imputing to Congress the intent to achieve such a result is too obvious to require more.

"effective as of the original date of the order and certificate." [8] Under this section petitioner was not a citizen in 1954 because he did not become a citizen in 1924. It is therefore useless to talk about whether § 241 (a)(4) makes an exception for aliens who were citizens when convicted because § 340 makes clear that in Congress' view they were always aliens. The distinction which the Court reads into § 241 is a distinction which § 340 declares nonexistent.

The Court takes the position that the relation-back provision of § 340 (a) was intended to deal only with problems of derivative citizenship, having nothing to do with deportability. The argument is that prior to the passage of the Act the judicial doctrine of relation-back was so limited, and that there is no evidence that § 340 was intended to expand its coverage. I find both branches of the argument untenable.

Prior to 1952 *Rosenberg* v. *United States,* 60 F. 2d 475 (C. A. 3d Cir. 1932), and *Battaglino* v. *Marshall,* 172 F. 2d 979 (C. A. 2d Cir. 1949),[9] held that members of a de-

---

[8] "It shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings . . . for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation, *and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate . . . ."* (Emphasis added.)

[9] Revocation of fraudulently obtained naturalization certificates was authorized by statute in 1906; however, not until the 1952 Act was there an express statutory provision that revocations were to have retroactive effect. The judicial doctrine of relation-back developed in the interim. Although *Rosenberg* was the first case to apply the doctrine, dictum in this Court's decisions as early as 1912

naturalized alien's family derive through him no citizenship rights because "the certificate of naturalization was simply a paper fraud and conferred at the time of its grant no rights whatever . . . ." *Rosenberg* v. *United States,* 60 F. 2d, at 476. But the principle stated in those cases was by no means limited to problems of derivative citizenship, as is shown by the Second Circuit's decisions in *Eichenlaub* v. *Watkins,* 167 F. 2d 659 (C. A. 2d Cir. 1948), aff'd *sub nom. Eichenlaub* v. *Shaughnessy,* 338 U. S. 521, and *Willumeit* v. *Watkins,* 171 F. 2d 773 (C. A. 2d Cir. 1949), aff'd *sub nom. Eichenlaub* v. *Shaughnessy,* 338 U. S. 521. These two cases, which, as shown earlier, involved the same issue as the instant case, were decided by the Court of Appeals on the theory that "the decree of denaturalization relates back, at least for this purpose. Cf. Rosenberg v. United States, 3 Cir., 60 F. 2d 475." [10] On appeal the decisions were affirmed on other grounds, the Court finding it unnecessary to pass on the relation-back issue.

The development of the relation-back theory did not go unnoticed by Congress. Section 338 (d) of the Nationality Act of 1940 contained a provision saving derivative citizenship rights where the revocation was not occasioned by actual fraud. And in a report on its study of the Immigration and Nationality Laws published April 20, 1950, the Senate Judiciary Committee summarized then-existing law as follows:

> "The effect of a decree of denaturalization, as distinguished from expatriation or forfeiture of citizen-

---

implied its existence. In *Johannessen* v. *United States,* 225 U. S. 227, 240–241, this Court cited with approval the following language from a lower court opinion: "It is [the applicant's] province, and he is bound, to see that the jurisdictional facts upon which the grant is predicated actually exist, and if they do not he takes nothing by his paper grant." Cf. *Luria* v. *United States,* 231 U. S. 9, 24.

[10] *Eichenlaub* v. *Watkins,* 167 F. 2d 659, 660.

ship, is to declare that the 'naturalized' person never was in fact naturalized, because either by fraud or illegality the statutory prerequisites were not met. The naturalization laws make certain reservations, saving the naturalization of children who derive citizenship from a parent from the alienage which they would otherwise incur because of the fraudulent or illegal naturalization." [11]

On the same day that the Senate Judiciary Committee published its report, the chairman of that Committee, Senator McCarran, introduced an omnibus bill, S. 3455, designed to incorporate all immigration and naturalization laws into one statute. That bill did not contain the general relation-back clause of the present § 340 (a). However, § 339 (f), substantially identical to § 340 (f) of the bill finally enacted, did provide for the consequences of denaturalization upon derivative rights. Had this bill been enacted, therefore, the legislative relation-back rule would have been limited to derivative citizenship matters, the problems of deportation being governed solely by the judicial doctrine, which was of course subject to change by the courts. However, Senator McCarran's next bill, S. 2055, introduced on August 27, 1951, contained not only a derivative citizenship relation-back clause (now § 340 (f)) such as had appeared in the earlier S. 3455, but also the general clause of § 340 (a).

The Government's theory as to the reason for this change is that since this Court's failure to pass on the relation-back rule in *Eichenlaub* cast doubt upon its continuing vitality as a judicial doctrine, Congress felt constrained to insure against the doctrine's being limited to derivative citizenship questions. While this is a reasonable suggestion it is neither expressly supported nor re-

---

[11] S. Rep. No. 1515, 81st Cong., 2d Sess., p. 755.

jected by the legislative history. This much, however, is clear: Prior to the passage of the 1952 Act four cases in the Courts of Appeals had applied the relation-back principle; two of these cases dealt with derivative citizenship rights and the other two with deportability. The 1952 Act not only dealt specifically with derivative citizenship but separately and expressly provided generally that denaturalization for concealment or willful misrepresentation was to be effective as of the date of the naturalization order. Congress thus provided its own relation-back doctrine and under it, unless it is to be rendered meaningless, Costello never legally became a citizen. He remained an alien and was an alien when he was convicted of the two crimes for which he has been ordered deported.

## IV.

The majority finds support for its holding in supposed implications from the recommendation provision of § 241 (b). In the Court's view the recommendation provision was intended to apply to all cases in which an alien might be deportable under § 241 (a)(4); the unavailability of this provision to one who was not an alien at the time of the second conviction is therefore evidence that Congress did not intend such aliens to be deportable, it is asserted. The Court thus holds that the authority to deport under subsection (a)(4) is limited to those cases in which the deportee can invoke a recommendation against deportation.

My view of § 241 (b) is somewhat different. Congress defined in § 241 (a) the criteria for deportability and described those classes of aliens who were no longer qualified to stay in this country by reason of their past acts and conduct. But in the case of § 241 (a)(4) aliens, those convicted of crimes involving moral turpitude, Con-

gress did not make its own judgment final in every case. Although the alien might have been convicted of two such crimes and therefore would have fallen within the § 241 (a)(4) category, the sentencing judge was given the power to order that the alien not be deported. The Court's view is that deportability in every case must depend upon the opportunity to exercise the power given in § 241 (b), as well as upon its actual exercise to forbid deportation. But I think the Court misconceives the scope and intent of § 241 (b), which is not coextensive with § 241 (a)(4) and which has nothing to do with the coverage of the latter section.

Section 241 (a)(4) speaks in general terms and seems to apply to postentry convictions for any two crimes involving moral turpitude. But there are other paragraphs of § 241 (a) which specify particular crimes in themselves justifying deportation. Some of these crimes may not involve moral turpitude; others may, and therefore fall within the literal language of § 241 (a)(4). A recommendation against deportation of aliens convicted of these latter crimes is nonetheless ineffective, either because subsection (b) explicitly excludes the crime from its coverage, as in the case of narcotics offenses,[12] or because the offense is separately listed in a subsection

---

[12] Subsection (b) states:

"The provisions of subsection (a)(4) of this section respecting the deportation of an alien convicted of a crime or crimes shall not apply . . . if the court sentencing such alien for such crime shall make, at the time of first imposing judgment or passing sentence, or within thirty days thereafter, a recommendation to the Attorney General that such alien not be deported, due notice having been given prior to making such recommendation to representatives of the interested State, the Service, and prosecution authorities, who shall be granted an opportunity to make representations in the matter. The provisions of this subsection shall not apply in the case of any alien who is charged with being deportable from the United States under subsection (a)(11) of this section." 8 U. S. C. § 1251 (b).

other than § 241(a)(4).[13] Obviously, therefore, Congress did not intend judicial review of deportability in every case where the commission of crime, whether involving moral turpitude or not, is the basis of the action.

Moreover, there are other situations within § 241(a)(4) where § 241 (b) procedures are unavailable and deportation nevertheless must follow. Under § 241 (a)(4) deportation may be based upon postentry convictions whether occurring in this country or abroad. The requirement of the prior law that postentry crimes be committed in this country was eliminated in the 1952 Act.[14]

---

[13] See *Jew Ten* v. *Immigration and Naturalization Service,* 307 F. 2d 832 (C. A. 9th Cir.). Cf. *United States ex rel. De Luca* v. *O'Rourke,* 213 F. 2d 759 (C. A. 8th Cir.); *Ex parte Robles-Rubio,* 119 F. Supp. 610 (D. C. N. D. Cal.).

[14] Section 19 of the 1917 Act specified three categories of aliens deportable because of conviction for crimes involving moral turpitude. The classes of aliens involved were the following:

(1) "[A]ny alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States."

(2) "[Any alien] who is hereafter sentenced more than once to such a term of imprisonment because of conviction in this country of any crime involving moral turpitude, committed at any time after entry."

(3) "[A]ny alien who was convicted, or who admits the commission, prior to entry, of a felony or other crime or misdemeanor involving moral turpitude."

Under the 1952 Act § 241 (a)(4) does not deal with deportation for crimes committed prior to entry, but the phrase "in this country," qualifying postentry convictions has been eliminated. As originally introduced by Senator McCarran, S. 2055 showed on its face that deportability for conviction of two crimes involving moral turpitude was not predicated on convictions obtained in this country. Section 241(a)(4) of that bill read:

"Any alien in the United States . . . shall . . . be deported who—

.      .      .      .      .

"within five years after entry is convicted of a crime involving moral turpitude and either sentenced to confinement or confined therefor in

It seems obvious that § 241 (b) procedures would be unavailable in those cases where the crimes are committed abroad; yet it is difficult to believe that deportation is proscribed in those cases. This was the view of the Court of Appeals for the Third Circuit under the prior law where the provision for deportation for crimes committed abroad prior to entry [15] was ostensibly subject to the terms of § 241 (b)'s predecessor providing the same broad judicial veto.[16]

---

a prison or corrective institution for a year or more, or who at any time after entry is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial; or at any time after entry is convicted *in the United States* of any criminal offense, not comprehended within any of the foregoing, if the Attorney General in his discretion concludes that the alien is an undesirable resident of the United States." (Emphasis added.)

The clause authorizing deportation in the discretion of the Attorney General for conviction in the United States of any criminal offense was eliminated after a conference between Senators McCarran and Humphrey. 98 Cong. Rec. 5756, 5758.

[15] *Rasmussen* v. *Robinson*, 163 F. 2d 732, 734 (C. A. 3d Cir.), stated that:

"[T]his portion of the statute provides that the recommendation shall be made to the 'Attorney General'. The 'Attorney General' referred to is the Attorney General of the United States. The 'recommendation' is mandatory upon him. . . . It follows that the judges who are to make the recommendation are to be judges of courts of the United States or of the States for Congress certainly did not intend to impose the mandate of a foreign judiciary on the Attorney General of the United States. This means that crimes committed prior to entry, not within the United States, are not within the proviso, but crimes committed by an alien, in the United States, prior to entry, are within the proviso." Cf. *United States* v. *Hughes*, 116 F. 2d 613 (C. A. 3d Cir.).

[16] Section 19 of the 1917 Act provided:

"[T]he provision of this section respecting the deportation of aliens convicted of a crime involving moral turpitude shall not apply to one who has been pardoned, nor shall such deportation be made or

I think Costello's is another case in which Congress could not have intended the unavailability of § 241 (b) procedures to bar deportation. Under the Court's view no denaturalized alien can be deported for the commission of two or more crimes while a citizen. Congress intended no such result. It intended, as § 241 (b) expressly says, to bar deportation only when there was a judicial determination of nondeportability. There is none here. In Costello's case, and those like it, the judge has no opportunity to exercise his power under § 241 (b) because the convicted defendant, actually an alien under the law, appears before him with a certificate of citizenship, obtained by his own fraud, and prefers to continue the masquerade and to claim the protections of citizenship. In these circumstances, the lack of judicial consideration of Costello's deportability should not be equated to a judge's determination of nondeportability. This is especially true here since Costello knew of the denaturalization proceedings which had been instituted against him prior to his two convictions for tax fraud.[17]

directed if the court, or judge thereof, sentencing such alien for such crime shall, at the time of imposing judgment or passing sentence . . . make a recommendation . . . that such alien shall not be deported."

[17] The petitioner and the majority suggest that if petitioner had been an alien at the time of his trial he could have offered to plead guilty to one count of income tax evasion in return for a *nolle prosequi* on the remaining counts, thereby avoiding the possibility of being convicted for two crimes. This is unrealistic for two reasons. At the time of the trial, denaturalization proceedings were pending against petitioner. *United States* v. *Costello,* 145 F. Supp. 892, reversed, 247 F. 2d 384 (C. A. 2d Cir.), reversed, 356 U. S. 256. He was therefore aware of the deportation implications flowing from conviction on dual counts, and was in a position to bargain as he felt most advantageous to himself. And even more speculative than the question of what the petitioner might have done had conditions been different is whether the Government, with denaturalization proceedings pending against Frank Costello, would have agreed to a *nolle prosequi* which would foreclose the possibility of later deportation proceedings.

Since I find no inconsistency between the language, background and purpose of § 241 (a)(4) on the one hand, and implications from § 241 (b) on the other, I regard the Court's reliance on *Fong Haw Tan* v. *Phelan,* 333 U. S. 6, as misplaced.   I have no quarrel with the doctrine that where the Court is unable to discern the intent of Congress, ambiguities should be resolved in favor of the deportee, but here there is a clear .expression of congressional purpose.   I would carry it out.