**UNITED STATES ex rel. STRACHEY v. REIMER, Com'r of Immigration.**

No. 212.

Circuit Court of Appeals, Second Circuit.

Jan. 23, 1939.

Arthur Garfield Hays, of New York City (Arthur Garfield Hays, Oscar Stabiner, and Joseph Cassidy, all of New York City, of counsel), for relator-appellant.

Lamar Hardy, U. S. Atty., of New York City (Irvin C. Rutter, Asst. U. S. Atty., of New York City, of counsel), for respondent-appellee.

Horace G. Marks, of New York City, amicus curiae.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from an order of the District Court for the Southern District of New York dismissing a writ of habeas corpus. The writ was issued to review the legality of the action of the Department of Labor in excluding from the United States the relator Evelyn John St. Loe Strachey, a British subject, who arrived at the port of New York, on October 10, 1938, to engage in a lecture tour for which he was under contract.

In order to come to the United States he had applied to the American Consul at London for a passport visa as a non-immigrant, visiting the country temporarily for business. His application resulted in the issue to him on September 7, 1938, of Passport Visa No. 2126. Upon the issue of the visa he engaged passage on the S. S. Normandie, which was to sail from England on October 5, 1938, and to arrive at New York on October 10, 1938. The visa was issued to the relator as a temporary visitor pursuant to Section 3 (2) of the Immigration Act of 1924, 8 U.S.C.A. § 203(2). On the morning of October 5, before sailing, he was requested to call at the Consulate to discuss the visa granted on September 7. At an interview with the vice-consul he was interrogated in respect to membership in the Communist Party and then stated under oath "that he was not a member of any Communist Party, that he was not opposed to organized government and that he did not advocate the overthrow of any government by force and violence". At the con-

clusion of the interview the vice-consul advised him to postpone his sailing until his case could receive further consideration, because of the possibility of his being denied admission on arriving at New York. The relator stated that he would consider the matter and would call back within two hours. Later he telephoned to the vice-consul that he had communicated with friends in England and in New York who had advised him to sail on the Normandie, as he had planned. He embarked October 5 accordingly.

The relator admitted the correctness of the foregoing but added that at the interview with the vice-consul he had asked the latter whether he had instructions or intended to cancel the visa, whereupon the vice-consul said that he had not, and had received no advices from Washington that the relator would not be admitted to the United States.

On October 7, 1938, the United States Consul at London cabled our Department of State that he had received information from a confidential, reliable source, that the relator was a member of the Communist Party and that at the National Congress held at Birmingham, England, in September, 1938, he had been elected to the Central Executive Committee of the Communist Party of Great Britain. The cable also stated that the Consul was in possession of a mimeographed circular and printed card indicating that the relator was to lecture on the capitalist system on January 27, at the Co-op Cafe, High St. N., under the auspices of the East Ham. Branch of the Communist Party, and that Ben Bradley and Ted Bramley, well known British Communists, were also scheduled to speak, and added that the relator had in recent months contributed frequently to the London Daily Worker, a recognized organ of the British Communist Party, and in the issue of July 6, 1938, had reviewed a new edition of Karl Marx's Capital, and in the issue of July 1 had contributed an article entitled: "Why Our Liberties Matter."

In a cable to the State Department of October 8, 1938, the Consul stated that from information which had come to his attention he was satisfied that the relator was a member of the Communist Party of Great Britain, an organization affiliated with the Third International, and had obtained his visa through fraud. The Consul also informed the State Department, and requested it to inform the Labor Department, that he had rejected and cancelled the relator's visa.

A Board of Special Inquiry held a hearing at Ellis Island on October 11, 1938, at which the relator was examined and was confronted with communications from the Assistant Secretary of State to the Secretary of Labor in which the Secretary of State stated that the Department had received information by cable from the American Consul at London reciting the information he had obtained as to the relator's membership in the Communist Party and the other things we have already mentioned. The relator categorically denied that he was a member of the Communist Party of Great Britain and that at the National Congress of that party, held in Birmingham, in September 1938, he had been elected to the Central Committee. He stated that he was not present at any part of that National Congress, nor had he been present or taken part, directly or indirectly, in any other National Congress of the Communist Party of Great Britain. While he did not deny that he was billed to lecture on the capitalist system at Co-op Cafe, 1 High Street, and said that it was possible that the meeting there had been organized by the East Ham. Branch of the Communist Party, he said that he had spoken at meetings organized by the Communist Party, by branches of the Communist Party, by branches of the Labor Party, the Liberal Party, the League of Nations Union, and by many other bodies. He admitted that he had in recent months contributed to the London Daily Worker and had contributed the review of Karl Marx's Capital and the article entitled "Why Our Liberties Matter." He stated that he was by profession an author and a journalist and made frequent contributions to journals affiliated with all of the above political parties and that every statement he made to the Consul and the vice-consul when he obtained his visa, and at the interview on October 5, was true.

At the close of the hearing the Board of Special Inquiry denied him admission into the United States "as a non-immigrant, not in possession of a properly visaed passport as required by Executive Order #7865 dated April 12, 1938." He then prosecuted an appeal to the Secretary of Labor, who affirmed the exclusion order of the Board of Special Inquiry.

Thereupon a writ of habeas corpus was granted on the ground that the Consul had no power to revoke the passport visa and the relator "was entitled upon arrival in the United States to a hearing to establish that he had not obtained his passport through fraud, and that he was in no sense inadmissible as a non-immigrant under the rules, regulations and laws applicable thereto." The District Court dismissed the writ of habeas corpus and entered an order remanding the relator to the custody of the Commissioner of Immigration for deportation. From that order he has appealed.

■ The question before us is whether the Consul had power to revoke the visa after he had issued it and the relator had embarked for the United States. We think that the Consul had no such power and that the order dismissing the writ should be reversed with directions to grant a hearing as to the admissibility of the alien.

The alien sought admission under Subdivision (2) of Section 3 of the Act of 1924 as "an alien visiting the United States temporarily as a tourist or temporarily for business or pleasure." Section 15 of the Act, 8 U.S.C.A. § 215, provides that the admission of non-immigrants: "* * shall be for such time as may be by regulations prescribed, and under such conditions as may be by regulations prescribed * * *".

Pursuant to the authority thus conferred and to the more general authority to prescribe rules and regulations given by Section 24 of the Act, 8 U.S.C.A. § 222, Rule 3, Subdivision F, paragraph 2, of the Immigration Rules of January 1, 1930, provides that: "No alien shall be admitted to the United States as a non-immigrant unless such alien shall present to the proper immigration official, at the port of arrival, a passport or official documents in the nature of a passport issued by the government of the country to which he owes allegiance and duly visaed and authenticated by an American consular officer."

The requirement that a non-immigrant shall present a visaed passport is also found in the Presidential Executive Order No. 7865 of April 12, 1938, which we held valid as to temporary visitors in United States ex rel. London v. Phelps, 2 Cir., 22 F.2d 288, though it is unnecessary to rely on the Executive Order, as the Board of Special Inquiry did, since Immigration Rule 3, Subdivision F, paragraph 20, supra, requires a visa in such a case.

■ There is no statutory provision, no regulation and no decision empowering Consuls to revoke a visa which they have once granted and issued to an alien. If the power exists it is necessary to imply it. So far as the decisions go, no Consul has attempted to revoke a visa for fraud after it has once been issued, and the government has been left to inquire into the facts affecting its validity upon the hearing to be had at the port of entry. United States ex rel. Fink v. Reimer, 2 Cir., 96 F.2d 217; United States ex rel. Leibowitz v. Schlotfeldt, 7 Cir., 94 F.2d 263; Popa v. Zurbrick, 6 Cir., 45 F.2d 583; United States ex rel. Iorio v. Day, 2 Cir., 34 F.2d 920. The object of requiring visas, or at least one of the most important objects, has been to afford a preliminary investigation of the fitness of the alien to enter the country before he comes to our shores and there applies for admission. It may be that a Consul should have an implied power to revoke a visa before an alien has sailed, but it is a different thing to give sanction to such a power after the alien has gone to the trouble and expense of securing a passport, having it visaed by the Consul, paying for his passage and embarking on his journey. The result of such a ruling would be to leave the whole question of exclusion to Consuls in the different ports of embarkation. They would be able to issue visas and after they had become operative to revoke any of them at will. We can see no justification for implying such a power when it is nowhere expressed in the Act. It would necessarily be exercised without any opportunity on the part of the alien to question the reasons either of law or fact which prompted an official change of mind that had dislocated reasonable expectations and it accordingly would involve the possession of an essentially arbitrary discretion. The power of the government to exclude unfit aliens is preserved if a visa when once issued and acted upon is treated as sufficient to enable the alien to present himself at the port of entry for inspection and to prove his right to admission if the right exists. The relator in the case at bar has had no hearing as to whether the charges against him (which he has denied) are true or false. The Board acted solely on the ground that the American Consul

had revoked the visa though it had been issued to the alien in due course and he was en route to the United States prior to revocation. Such a power, we think, the Consul did not possess under the circumstances disclosed. It may be that the relator obtained his visa through a material misrepresentation which would justify the Board of Special Inquiry in holding it invalid, or that he should be excluded for other reasons. Such matters must be determined at a hearing on the merits.

The order is reversed and the relator is remanded with directions that he be given a hearing as to his admissibility on all grounds, including the charge that he obtained his visa by fraud.