**UNITED STATES ex rel. SANTARELLI v. HUGHES.**

**No. 7391.**

Circuit Court of Appeals, Third Circuit.

Dec. 13, 1940.

Louis B. LeDuc, of Camden, N. J., and C. Dudley Saul, Jr., and Francis Fisher Kane, both of Philadelphia, Pa., for appellant.

William F. Smith, acting U. S. Atty., and W. Orvyl Schalick, Asst. U. S. Atty., both of Trenton, N. J., for appellee.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This is another deportation case where, as in the one just filed,[1] the appeal is somewhat more to the head than to the heart. We qualify more because in the instant case there is one sympathy factor. The alien-relator is married and has an infant. On the other hand, he himself is less deserving of consideration than the seaman of the above-mentioned decision. The relator was born in Italy in 1899 and came to this country under the quota[2] in 1923. He has remained unnaturalized and in 1930 requited our hospitality by embezzling some $7,000 from the Philadelphia bank where he was employed. With these ill-gotten gains he fled to Canada and with them presumably bought a farm. There he was joined by his wife and there he lived under an alias until the happening in 1936 of the events here recorded. This flight from justice would apparently have been successful except for the weakness that was its occasion. The alien was arrested for theft by the Canadian provincial authorities. That led automatically to the discovery of his status as a fugitive from Pennsylvania.

As is customary, the Philadelphia police lodged a detainer at the Canadian jail and on his release therefrom took him into custody. With their prisoner they appeared before the board of inquiry designated by law[3] to admit or exclude aliens. The alien, quite understandably, had never applied to any consular official for an immigration visa[4] and equally understandably his departure from the United States was too hurried to afford an opportunity to secure the permit to re-enter[5] prescribed for one making a temporary visit abroad. The board of inquiry accordingly took the action indicated by the following note: "Alien is released in the custody of the above named detective and police officer, who are furnished with border letter to Inspector of Immigration and Naturalization, to ensure his *temporary entry* to answer to the charges within noted." Brief for Appellant and Appendix p. 32. (Italics ours.)

Upon the relator's return to Philadelphia, he was arraigned in the Quarter Sessions Court and pleaded guilty to both the indictments against him. He was represented by the assistant to the voluntary Public Defender of Philadelphia County. The sentence imposed by the sitting judge was 6 months to 5 years on one indictment and on the other probation for 5 years with a prescription against his leaving the jurisdiction. Our only knowledge of the proceedings attendant upon this sentencing comes from the testimony of the aforesaid assistant Public Defender given at the deportation hearing. According to him, the Quarter Sessions Judge expressed an unfavorable opinion of part of the immigration policy of the United States as at present enacted in its laws and suggested an amendment thereto designed to exempt aliens, who had married American citizens, from the operation thereof. In line with such idea, the learned Judge warned an assistant director of the immigration service that it would be acting at its peril if it attempted to deport the alien. The relator again showed his lack of integrity and requited, this time the judge, by violating his probation in that upon his speedy release from prison (after 6 weeks) he went to live in Camden. Here, also, this proved his undoing and provided these proceedings.

The arguments advanced both here and below are indicative of the impact of the punishment of banishment. We say that because their very meagreness is evidence of the tragic character of the hope. The government gives two reasons for deportation. They are: first, that the alien has outstayed his welcome, and second, that he is in an undesirable classification because he has admitted the commission of a crime

---

[1] U. S. ex rel. Markos Vounas v. Hughes, 3 Cir., 116 F.2d 171, filed December 2, 1940.

[2] Act May 19, 1921, 42 Stat. 5.

[3] 8 U.S.C.A. § 153.

[4] 8 U.S.C.A. § 202 (a).

[5] 8 U.S.C.A. § 213 (b); 8 CFR 25.3.

involving moral turpitude prior to entry.[6] Appellant's attempt to meet these contentions proceeds, as we have indicated, from desperation rather than from law. He ignores the first entirely and his argument on the second, although more detailed, is little stronger. The details, in order of strength, or should it be weakness, are threefold and run as follows: the crime must have been committed in the United States, it must have been admitted prior to entry, and there must have been no recommendation against deportation.

■ We were rather euphemistic in speaking of any welcome extended to this relator. The law requires of him and of any other alien either a consular visa or a re-entry permit as a condition precedent to entry. The writer of a note in the Columbia Law Review describes the procedure: "Key man in the administrative structure for the admission of aliens is the United States consul abroad. With visas required for both immigrants and temporary visitors, and with power to issue visas vested in the consul, his consent is a necessary condition to any further action of the Immigration authorities in passing upon the eligibility of the alien to entry." Aliens—Power of Consul to Revoke Visa for Alleged Membership in Communist Party, 39 Columbia Law Review 502, 503 (note).

It is probable that in the exercise of this power, the consul has absolute discretion and that the appeal against him is through diplomatic channels only. Aliens—Exclusion of Aliens—Power of Consul to Revoke Visa of Nonimmigrant, 52 Harvard Law Review 833 (note).[7] We need not, however, consider the extent of the consular power because very naturally under the circumstances our alien made no request for its exercise. If he had, it would seem little more than certain that he would not have been held eligible as a "previously lawfully admitted [immigrant] * * * returning from a temporary visit abroad", 8 U.S.C.A. § 204(b), United States v. Parisi, D.C., 24 F.Supp. 414. His receipt of a re-entry permit upon a departure to escape justice would have been similarly improbable, and here, too, no application was made. The board of inquiry therefore properly refused the alien permanent admission.[8] His status then became that of a temporary visitor under the statute and the regulations appropriate thereto.[9] The term, its purpose having been fulfilled, of his, we confess, somewhat uncomfortable visit has long since expired. He becomes deportable in consequence as an alien "who has remained longer than permitted under this Act".[10]

In his argument concerning the "commission etc. prior to entry", the appellant is guilty of one anachronism and one error. The anachronism arises from a decision of the Supreme Court rendered 7 years before our case, United States ex rel. Volpe v. Smith, 289 U.S. 422, 53 S.Ct. 665, 77 L.Ed. 1298. Prior to that decision, the Circuits had divided.[11] An interpretation against deportation could be spelled out of the fact that "deportation as a consequence of a crime committed in this country is especially provided for and made subject to certain qualifications" and "specifications necessarily limited to crimes committed in the United States", Statutory Construction in Deportation Cases, 40 Yale Law Journal 1283, 1287 (comment). On the other hand, the Supreme Court's view has been supported on more practical grounds, Criminal Law—Deportation of Aliens—Crimes Committed in this Country Prior to a Re-Entry, 28 Illinois Law Review 425.[12] At any rate, it is the law.

[6] The exact wording of the pertinent clause in the statute is: "Any alien who was convicted, or who admits the commission, prior to entry, of a felony or other crime or misdemeanor involving moral turpitude." 8 U.S.C.A. § 155.

[7] The power of revocation of already issued visas has been curbed by the much publicized Strachey case, United States ex rel. Strachey v. Reimer, 2 Cir., 101 F.2d 267.

[8] Taranto v. Haff, 9 Cir., 88 F.2d 85; Del Castillo v. Carr, 9 Cir., 100 F.2d 338; United States ex rel. Polymeris v. Trudell, 284 U.S. 279, 52 S.Ct. 143, 76 L.Ed. 291.

[9] 8 U.S.C.A. § 215; 8 CFR 3.29.

[10] Masahiko Inouye v. Carr, 9 Cir., 89 F.2d 447.

[11] Bendel v. Nagle, 9 Cir., 17 F.2d 719, 57 A.L.R. 1129; Medich v. Burmaster, 8 Cir., 24 F.2d 57; Wong Yow v. Weedin, 9 Cir., 33 F.2d 377; Wilson v. Carr, 9 Cir., 41 F.2d 704; Browne v. Zurbrick, 6 Cir., 45 F.2d 931.

[12] The learned author says: "This result, perhaps, should not be criticized when the attitude of Congress in recent years consistently recommends a more arbitrary treatment of aliens. Consequently, even if the Supreme Court has stretched the literal meaning of the provision and has disregarded the fate of the individual alien, the Supreme Court

The error arises from the advocacy of a grammatical contortion. We may say of a grammatical contortion so often attempted that its denial has found its way into a rule of law.[13] It is asserted that the phrase "prior to entry" modifies "admitted" and not "commission", hence the admission (here the plea of guilty) having taken place in Philadelphia, the clause does not apply. Any such construction flies in the face of common sense in grammar hardened into law. It violates "one of the simplest canons of statutory construction, namely, that a limiting clause is to be restrained to the last antecedent unless the subject matter requires a different construction".[14] Here "subject matter does not require a different construction" for plainly the United States is interested in the character of the alien and not in his conversation. The phrase "prior to entry",

then, has a "peculiar fitness" when applied to commission.

The construction of the recommendation provision of the statute[15] may depend upon the light in which it should be regarded. As now written, the sentencing judge's action is mandatory upon the Secretary.[16] He can mould the punishment by withholding banishment. His action, then, is judicial and so subject only to such clear legislative prescription as the 30-day provision.[17] For instance, a sentence would not be invalidated because of particular language selected or garments worn at the time of its imposition. The informality,[18] therefore, of the proceedings in the case at bar should not vitiate. If Congress should change the statute as suggested,[16] and approximate our practice to that of its English counterpart,[19] an interesting question is implicit. The action becomes

has at least made the law conform to the preponderant Congressional and lay thought of the day. At any rate if, after conviction for a crime involving moral turpitude, an alien gangster should cross our international boundary for a few hours, if only to the Canadian Falls at Niagara, the federal courts may rule in favor of deportation and have good reason to believe that they will be supported by the Supreme Court." 28 Illinois Law Review 425, 427, 428.

[13] Incidentally, although counsel and the court below discuss the grammar, they fail to give the rule its name.

[14] 59 C.J. p. 985; Beal, Cardinal Rules of Legal Interpretation, 2d Ed., 66; Puget Sound Electric Ry. v. Benson, 9 Cir., 253 F. 710.

[15] "The provision of this section respecting the deportation of aliens convicted of a crime involving moral turpitude shall not apply to one who has been pardoned, nor shall such deportation be made or directed if the court, or judge thereof, sentencing such alien for such crime shall, at the time of imposing judgment or passing sentence or within thirty days thereafter, due notice having first been given to representatives of the State, *make a recommendation to* the Secretary of Labor that such alien shall not be deported in pursuance of this subchapter." 8 U.S. C.A. § 155. (Italics ours.)

[16] In hearings on an attempted clarification of the Act, it appeared that the Congress considered reversing its position:

"Mr. Shaughnessy: May I say that there is another difference there? The judge can within 6 months after sentence, recommend against deportation; but his recommendation in this bill is not

binding upon the Secretary of Labor. She can be guided and assisted by the judge's recommendation. * * * And the Secretary of Labor is not bound by it; but naturally, she will be assisted in reaching her decision by the recommendation of the judge who has had an opportunity to view the alien." Deputy Commissioner of Immigration and Naturalization, Public Hearings Before Committee on Immigration and Naturalization, 73d Cong., 2d Sess., H.R. 9518, Hearings No. 73-2-2, 1934, p. 13.

[17] United States ex rel. Arcara v. Flynn, D.C., 11 F.2d 899; United States ex rel. Klonis v. Davis, 2 Cir., 13 F.2d 630.

[18] "Mr. Shaughnessy: We frequently find that judges in sentencing aliens do not know of this authority to recommend, and if they do not do it within 30 days they cannot do it at all. And this gives them up to 6 months in which to watch aliens and keep them under their surveillance, and to think the matter over and make their recommendation regarding deportation to the Secretary." Deputy Commissioner of Immigration and Naturalization, Public Hearings Before Committee on Immigration and Naturalization, 73d Cong., 2d Sess., H.R. 9518, Hearings No. 73-2-2, 1934, p. 13.

[19] "The Secretary of State *may* make a deportation order if any Court (including a court of summary jurisdiction) *certifies* that the alien has been convicted of any offence for which the court has power to impose imprisonment without the option of a fine, or of certain summary offences, and if the court *recommends* that a deportation order should be made (either in

administrative and so subject to strict construction. "Recommendation to", as a matter both of courtesy and of English, requires some form of bilateral communication rather than a mere unilateral pronouncement. The British Act omits the preposition and, as far as the cases indicate, compliance seems to result from the sentence of the court.[20]

However, we do not feel called upon to decide this question because, in our view, the "prior to entry" class of deportables is excluded from the recommendation clause. Statutory language must be construed in a sense of accomplishment. American Judges can scarcely impose sentences in foreign courts. So to hold the statute pertinent would cut it down to the rare case[21] (that at bar) where the alien defendant leaves and then re-enters the country (here on a waiver of extradition) for the purpose of standing trial for, or pleading guilty to, a crime involving moral turpitude locally committed. It is not essential, but it is comforting to have one's theory of statutory construction bolstered by legislative history.[22] So it appears from the attempted clarification of the Immigration Act in 1934 hereinabove referred to that the Bill as introduced contained the following language:

"Sec. 2(a). An alien who entered the United States * * * shall be subject to deportation at any time if he * * *

"(11) Was convicted, or has admitted the commission, prior to entry, of a crime involving moral turpitude; * * *

"(b) An alien subject to deportation under the *eighth, ninth, tenth,* or *twelfth* clauses of the preceding subsection shall not be deported until the termination of his imprisonment; and in deciding whether such alien is subject to deportation a conviction of crime shall not be considered if * *

"(2) The judge before whom, or the presiding judge of the court in which, the conviction was secured, within 6 months after such conviction * * * and after giving due notice to representatives of the state, makes a recommendation that the conviction shall not be considered, and if the Secretary of Labor approves that recommendation." 73d Cong., 2d Sess., H. R. 9518, p. 4. (First italics ours.)

In the discussion between members of the Committee, we find the following:

"Mr. Dies: Before you get to that, let me ask you whether there are any other changes on page 4 (*section 2*) in the existing law.

"The Chairman: No." Public Hearings Before Committee on Immigration and Naturalization, 73d Cong., 2d Sess., H. R. 9518, Hearings No. 73-2-2, 1934, p. 13. (Italics ours.)

So the recommendation provision in the new bill specifically did not apply to aliens deportable under a section in haec verba with that of the corresponding one in the statute at bar. In explanation, the Chairman of the Committee in charge of the bill stated that it was simply a reenactment of the existing law.

The order of the District Court dismissing the writ is affirmed.

---

addition to or in lieu of sentence) in the case of that alien.

"*Recommendation* for deportation is a matter of *judicial discretion*, but in making a *recommendation* the Court should take into consideration the period of the alien's residence in this country; the fact that deportation of a married woman would separate her from her husband; that an alien has a family domiciled here; the liability of an alien to be put to death on his return to his own country, and the Court may consider an intercession on behalf of the alien by the prosecution." 1 Halsbury's Laws of England, 2d Ed., Aliens, part 7, sec. 3, para. 821, p. 485. (Italics ours.)

[20] R. v. Kleiss (1910) 4 Cr.App.Rep. 101; R. v. Zausmer (1911) 7 Cr.App.Rep. 41; R. v. Grunspan (1913) 8 Cr.App. Rep. 269; R. v. Shaffner (1920) 14 Cr. App.Rep. 131; R. v. Gilbert (1921) 16 Cr.App.Rep. 34; R. v. Rogoff (1924) 18 Cr.App.Rep. 1.

[21] Brought within the statute, as we have seen, by Supreme Court interpretation rendered some 16 years after its enactment.

[22] Strictly, we suggest an extension of the principle. The opinion expressed is ex post facto, but is that of a participant in the original legislative proceedings and so that of an expert.