UNITED STATES of America

v.

Nicolas Manueles MONTEJO,
Defendant.

No. CRIM.2:04 CR 149.

United States District Court,
E.D. Virginia,
Norfolk Division.

Jan. 18, 2005.

Joseph E. DePadilla, United States Attorney's Office, Michael C. Moore, United States Attorney's Office, Norfolk, VA, for Plaintiffs.

Samuel Warrenton Meekins, Jr., Wolcott Rivers Wheary Basnight & Kelly PC, Virginia Beach, VA, Riley Henderson Ross, III, Office of the Federal Public Defender, Norfolk, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER

DOUMAR, District Judge.

The Aggravated Identity Theft Penalty Enhancement Act was promulgated by Congress on July 15, 2004. Pub. L 108–275, § 2(a), 118 Stat. 831. The Act created 18 U.S.C. § 1028A, which states in relevant part: "Whoever, during and in relation to any felony violation enumerated in subsection (c), *knowingly* transfers, possesses, or uses, without lawful authority a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." *Id.* § 1028A(a)(1) (emphasis added).

Now before the Court is Defendant Nicolas Manueles Montejo's Motion for Judgment of Acquittal, pursuant to Federal Rule of Criminal Procedure 29, challenging his conviction under 18 U.S.C. § 1028A(a)(1) on the ground that the Government did not prove that he knew that the means of identification that he unlawfully possessed actually belonged to another person, which he contends is an essential element of the offense. The question presented by Montejo's motion, an issue of first impression, is whether § 1028A(a)(1)'s mens rea requirement applies only to the *conduct* proscribed by the statute—*transfer, possession,* or *use*—or instead extends to other elements of the offense, in particular the *object* used to carry out the proscribed conduct: *another person's means of identification.*

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Defendant Nicolas Manueles Montejo is a Mexican national who entered the United States illegally by walking across the Mexico–United States border in January 2002. Sometime thereafter he traveled to Phoenix, Arizona, where he managed to purchase a false resident alien card and a false social security card for $60.00. Resident alien cards, issued by the Department of Homeland Security ("DHS"), Citizen and Immigration Services, contain the holder's name, photograph, date of birth, alien registration number, and an expiration date. Alien registration numbers are used by non-citizens as proof of legal entry into the United States and also demonstrate that the (legal) holder is lawfully eligible for employment. Like social security numbers, they are assigned to a single person and, once used, are not reassigned to anyone else.

After purchasing the cards, Montejo journeyed from Phoenix to Norfolk, Virginia, where he used them to gain employment at Network Industries, Ltd. ("Network Industries"). Network Industries provides marine repair services and other technical support to commercial customers and government agencies, including the Department of Defense and DHS. As it turns out, the alien registration number contained on the resident alien card that Montejo purchased belonged to a Tanzanian national who is now a naturalized citizen of the United States. Likewise, the

social security number that he purchased was assigned to a different, unidentified individual. While Montejo was aware that the cards were false when he purchased them and that it was illegal to present them as his own, he was not aware that the numbers associated with the cards actually belonged to other individuals. He became aware of that fact on or after August 9, 2004, when agents from the Immigration and Customs Enforcement Division of DHS took him into custody at Network Industries' Norfolk offices after learning that he was in fact an illegal immigrant.

A search incident to arrest uncovered the false resident alien card described above, which no longer contained a picture. After being apprised of his Fifth Amendment *Miranda* rights, Montejo elected to waive them and admitted to the facts recited above. *See* Statement of Facts, Doc. No. 18 (Sept. 23, 2003). There is no allegation that Montejo ever provided a false identity to Network Industries in order to gain employment there; rather, he only represented that he was legally eligible for employment by providing Network Industries with the false cards bearing his own name. In addition, there are no victims of the alleged offense or any allegations that Montejo's motive related to something other than the desire to gain employment.

### B. Procedural History

Montejo was named in a four-count Criminal Indictment charging him with possession of a false immigration document in violation of 18 U.S.C. § 1546(a) (Count One), use of a false immigration document in violation of 18 U.S.C. § 1546(b)(2) (Count Two), false representation of a social security number in violation of 42 U.S.C. § 408(a)(7)(B) (Count Three), and aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) (Count Four). Trial was set for September 23, 2004. On August 26, 2004, due to a con-

flict stemming from representation of defendants charged with similar offenses arising from a similar set of facts, Montejo's Federal Public Defender withdrew from representing him. The Court appointed new counsel on August 30, 2004.

Shortly before trial, on September 17, 2004, Montejo was granted leave to file a Motion to Quash Count Four of the Indictment beyond the pre-trial motions deadline because he had been appointed new counsel. The Motion to Quash contended that Count Four of the Indictment was legally insufficient because it failed to identify the person whose identification was allegedly stolen, which Montejo claimed—and claims now in the instant Motion—is an essential element of aggravated identity theft. 18 U.S.C. § 1028A(a)(1). The Motion to Quash was denied in a written Order on September 21, 2004 because, regardless of the exact scope of the knowledge requirement, the language in the Indictment adequately informed Montejo of the charges against him.

Following denial of the Motion to Quash, prior to trial, the parties entered into an oral plea agreement, whereby the Government agreed to drop Count Two of the Indictment, Montejo agreed to plead guilty to Counts One and Three, and the parties agreed to proceed to a bench trial on Count Four, the aggravated identity theft charge. Additionally, the parties stipulated to the substantive facts set forth above, which are contained in a Statement of Facts validly executed by Montejo, his lawyer, and counsel for the Government, and which was filed in the case record on the day of trial. Doc. No. 18 (Sept. 23, 2004). Since the charge contained in Count One, possession of a false immigration document in violation of 18 U.S.C. § 1546(a), which Montejo pled guilty to, is a predicate felony for aggravated identity theft, *see* 18 U.S.C. § 1028(c), the only

issue to be determined at the bench trial was whether Montejo's level of knowledge was sufficient to convict him of aggravated identity theft in violation of § 1028A(a)(1), the charge contained on Count Four.

As the parties stipulated to the substantive facts, there was no need for evidence to be presented at the September 23, 2004 bench trial. The only issue addressed was the scope of § 1028A(a)(1)'s mens rea requirement. The Government asserted that all § 1028A(a)(1) requires is that the accused knew that the means of identification he transferred, possessed, or used was not his own, regardless of whether he thought it belonged to another person or instead believed that it was fake. Conversely, Montejo argued that § 1028A(a)(1) requires that the accused was aware that the means of identification actually belonged to another individual. The Government countered that, even if § 1028A(a)(1) requires the accused to have known that the means of identification actually belonged to another person, Montejo's conduct was willfully blind to that possibility, which in and of itself satisfies the requirement of "knowledge."

At the conclusion of oral argument, the Court found that the Government satisfied its burden and adjudged Montejo guilty of aggravated identity theft. Before the proceedings were adjourned, Montejo moved for a Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29, contending again that his conviction cannot be sustained based on the stipulated facts because the crime of aggravated identity theft requires the accused to have known that the means of identification he unlawfully possessed actually belonged to another person. The Court acknowledged the timeliness of the Motion and established a briefing schedule for the parties to expound upon the scope of § 1028A(a)(1)'s scienter requirement. Having received and reviewed the parties' memoranda, the Court dispensed with additional oral argument on the issue involved because the facts and legal contentions are adequately presented in the parties' memoranda and additional argument would not aid in the decisional process. Consequently, the Motion is ripe for judicial resolution.

## II. STANDARD OF REVIEW

### A. Motion for Judgment of Acquittal

■■■ "A defendant may move for a judgment of acquittal ... within 7 days after a guilty verdict...." Fed.R.Crim.P. 29(c)(1). The question raised by a motion for a judgment of acquittal is whether "as a matter of law the government's evidence is insufficient 'to establish factual guilt' on the charges in the indictment." *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir.2003) (quoting *Smalis v. Pennsylvania*, 476 U.S. 140, 144, 106 S.Ct. 1745, 90 L.Ed.2d 116 (1986)). It goes without saying that, as a matter of law, the government bears the burden of proving the essential elements of the offense charged beyond a reasonable doubt. Thus, in reviewing a motion for judgment of acquittal, the court must, "considering the evidence and all reasonable inferences that can be drawn from it in the light most favorable to the government, determine whether any rational factfinder could have found the essential elements of the crimes charged beyond a reasonable doubt." *United States v. Childress*, 26 F.3d 498, 501 (4th Cir.1994); *accord Bonds v. Beale*, 145 F.Supp.2d 708, 720 (E.D.Va.2001) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [quotations omitted].").

Whether the evidence is sufficient to uphold Montejo's conviction depends on whether 18 U.S.C. § 1028A(a)(1)'s mens rea requirement applies only to the con-

duct involved—transfer, possession, and use—or extends to every element of the offense, and in particular the object of the proscribed conduct—the means of identification of another person. The scope of the mens rea requirement is a function of Congress' intent as expressed by the statute itself. *See Staples v. United States,* 511 U.S. 600, 605, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) ("[The Supreme Court has] long recognized that determining the mental state required for commission of a federal crime requires 'construction of the statute and ... inference of the intent of Congress. [internal quotations omitted].' "). That is especially the case when ascertaining the scope of the mens rea requirement of federal crimes, which are crimes only by virtue of having been promulgated by Congress. *See Liparota v. United States,* 471 U.S. 419, 424, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute."). Consequently, to resolve the instant Motion, the Court must undertake the familiar judicial taskwork of statutory interpretation.

**B.  Statutory Interpretation**

■■■  "When interpreting a statute, [a court's] inquiry begins with the text." *United States v. Simmons,* 247 F.3d 118, 122 (4th Cir.2001). The plain meaning of the statute is ascertained by scrutinizing the statute's "language, structure, and purpose." *United States v. Horton,* 321 F.3d 476, 479 (4th Cir.2003) (internal quotations omitted). Words in the text of the statute

should be accorded "their ordinary meaning." *United States v. Sheek,* 990 F.2d 150, 152 (4th Cir.1993). However, "[s]tatutes, including penal enactments[,] are not inert exercises in literary composition. They are instruments of government, and in construing them the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down." *United States v. Jones,* 993 F.2d 1131, 1135 (4th Cir.1993). Nonetheless, courts "should not look beyond [the plain meaning] unless there is ambiguity or unless the statute as literally read would contravene the unambiguously expressed legislative intent gleaned from the statute's legislative history. [citations omitted.] Even if the result appears to be anomalous or absurd in a particular case, the court may not disregard unambiguous language." *Sheek,* 990 F.2d at 152–53 (citations omitted). In the rare circumstance where a court cannot resolve "a 'grievous ambiguity or uncertainty' in the meaning of the statute, the rule of lenity requires [it] to adopt the construction most favorable to the defendant." *Horton,* 321 F.3d at 479 (quoting *Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)).

**III.  ANALYSIS**

**A.  The Plain Meaning**

The Aggravated Identity Theft Penalty Enhancement Act was enacted by Congress on July 15, 2004, Pub. L 108–275, § 2(a), 118 Stat. 831, and states in relevant part: "Whoever, during and in relation to any felony violation enumerated in subsection (c),[1] *knowingly* transfers, possesses,

---

1. The enumerated felonies contained in subsection (c) of 18 U.S.C. § 1028A are:
   (c) **Definition.**—For purposes of this section, the term "felony violation enumerated in subsection (c)" means any offense that is a felony violation of—
   (1) section 641 (relating to theft of public money, property, or rewards), section 656

(relating to theft, embezzlement, or misapplication by bank officer or employee), or section 664 (relating to theft from employee benefit plans);
(2) section 911 (relating to false personation of citizenship);

or uses, without lawful authority a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A(a)(1) (emphasis added). The scope of the mens rea requirement depends on whether the word "knowingly" modifies only "transfers, possesses or uses," or whether it also modifies "a means of identification of another person."

### 1. Language

Ordinarily, qualifying words, such as "knowingly" in § 1028A(a)(1), apply only to their immediate antecedent. *See Nat'l Coalition for Students with Disabilities Educ. and Legal Def. Fund v. Allen*, 152 F.3d 283, 288 n. 6 (4th Cir.1998) (underscoring, in a civil case, "the fundamental canon of statutory construction that a qualifying phrase refers solely to its immediate antecedent. 2A *Sutherland Statutory Construction* § 47.33 (5th ed.1992)"). Since the term "knowingly" is immediately antecedent to the phrase "transfers, possesses, or uses," it must be read only to qualify those words. Accordingly, the ordinary meaning of the words in the statutory text reveals that the mens rea requirement applies only to the conduct involved, and not to any other elements of the offense. To extend the mo-

difier—"knowingly"—any further yields a result not countenanced by the words' ordinary meaning. *Cf. Students with Disabilities*, 152 F.3d at 288 n. 6 ("Absent an expression of contrary congressional intent, the failure to apply this canon 'flies in the face of common sense in grammar hardened into law.' *United States ex rel. Santarelli v. Hughes*, 116 F.2d 613, 616 (3d Cir.1940).").

Montejo contends that the scienter requirement nonetheless applies to every element of the offense. Interpreting § 1028A(a)(1) otherwise, he argues, "enlarges the reach of [the] enacted crime[ ] by constituting [it] from [something] less than the incriminated components contemplated by the words used in the statute." *Morissette v. United States*, 342 U.S. 246, 250, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Put differently, restricting the mens rea requirement to the conduct involved—transfer, possession, or use—relieves the Government of the generally accepted burden of proving that a defendant possessed an "evil-minding mind." *Id.* at 251, 72 S.Ct. 240; *see also id.* ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a

(3) section 922(a)(6) (relating to false statements in connection with the acquisition of a firearm);

(4) any provision contained in this chapter (relating to fraud and false statements), other than this section or section 1028(a)(7);

(5) any provision contained in chapter 63 (relating to mail, bank, and wire fraud);

(6) any provision contained in chapter 69 (relating to nationality and citizenship);

(7) any provision contained in chapter 75 (relating to passports and visas);

(8) section 523 of the Gramm–Leach–Bliley Act (15 U.S.C. 6823) (relating to obtaining customer information by false pretenses);

(9) section 243 or 266 of the Immigration and Nationality Act (8 U.S.C. 1253 and 1306) (relating to willfully failing to leave the United States after deportation and creating a counterfeit alien registration card);

(10) any provision contained in chapter 8 of title II of the Immigration and Nationality Act (8 U.S.C. 1321 et seq.) (relating to various immigration offenses); or

(11) section 208, 811, 1107(b), 1128B(a), or 1632 of the Social Security Act (42 U.S.C. 408, 1011, 1307(b), 1320a–7b(a), and 1383a) (relating to false statements relating to programs under the Act).

consequent ability and duty of the normal individual to choose between good and evil."); *United States v. United States Gypsum Co.*, 438 U.S. 422, 436, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) ("[T]he existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo–American criminal jurisprudence. [internal quotations omitted]."); *United States v. Wilson*, 133 F.3d 251, 261 (4th Cir.1997) ("[I]n Anglo–American jurisprudence, criminal offenses are ordinarily required to have a mens rea.").

In support, Montejo relies on *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 68, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), where the United States Supreme Court determined that the term "knowingly" in 18 U.S.C. §§ 2252(a)(1) and (2),[2] which prohibit certain activities related to material involving the sexual exploitation of minors, applied to the age of minority, despite the fact that the term "knowingly" and the age of minority were "set forth in independent clauses separated by interruptive punctuation." Montejo argues that, as in *X–Citement Video*, this Court should extend the scienter requirement to every element of the offense even though doing so requires this Court to apply the modifier—"knowingly"—to language outside its immediate antecedent phrase.

Montejo further relies on *Staples*, where the Supreme Court imposed a scienter requirement on a portion of The National Firearms Act, 26 U.S.C. § 5845(d),[3] where none was explicitly imposed. 511 U.S. at 619, 114 S.Ct. 1793. Specifically, the Supreme Court "conclude[d] that the background rule of the common law favoring mens rea" controlled, and held that an offender must know that the firearm in his possession is within the purview of the Act. *Id.*

While Montejo correctly argues that the application of mens rea to crimes is generally favored, neither *X–Citement Video* nor *Staples* mandate that outcome in this case. To the contrary, they are binding authority that the mens rea requirement applies only to those elements of the offense that punish otherwise innocent conduct. In *X–Citement Video*, the Supreme Court emphasized that extending the mens rea requirement of 18 U.S.C. §§ 2252(a)(1) and (2) to the age of minority was essential to protecting conduct that is otherwise legal and constitutionally protected, except for the fact that it involves minors. *Id.* at 73, 115 S.Ct. 464 ("[T]he age of the performers is the crucial element separating legal innocence from wrongful conduct."). Since transporting and receiving sexually explic-

---

**2.** The text of 18 U.S.C. § 2252(a), with emphasis added, reads:

(a) Any person who—

(1) *knowingly* transports or ships in interstate or foreign commerce by any means including by computer or mails, any visual depiction, if—

(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;

(2) *knowingly* receives, or distributes, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or

so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce or through the mails, if—

(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;

**3.** The relevant text of 26 U.S.C. § 5861(d), as it existed when the Supreme Court interpreted it in *Staples*, read: "[i]t shall be unlawful for any person ... to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record."

it, non-obscene material that does not involve minors is constitutionally-protected conduct, the Supreme Court imputed the scienter requirement to the age of the performers in order to ensure the constitutionality of the statute, *id.* at 78, 115 S.Ct. 464, and to safeguard the reasonable expectations of otherwise non-felonious actors who "would reasonably expect to be free from regulation when trafficking in sexually explicit, though not obscene, material involving adults." *Id.* at 73, 115 S.Ct. 464. Similarly, in *Staples,* the Supreme Court extended the mens rea requirement of 26 U.S.C. § 5861(d) to the firearm involved because not doing so would criminalize "a long tradition of widespread *lawful* gun ownership by private individuals in this country." 511 U.S. at 618, 114 S.Ct. 1793 (emphasis added); *see also Liparota,* 471 U.S. at 426, 105 S.Ct. 2084 (applying the mens rea requirement in 78 Stat. 708, as amended, 7 U.S.C. § 2024(b)(1),[4] which prohibits food stamp fraud, beyond the phrase antecedent to the word "knowingly" in the statute because "to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct").

■■ Far from commanding this Court to extend the mens rea requirement to every element of an aggravated identity theft offense in violation of § 1028A(a)(1), *X–Citement Video* and *Staples* require that non-explicit or ambiguous mens rea requirements be extended only insofar as necessary to protect otherwise innocent conduct. In this case, not only is the mens rea requirement in § 1028A(a)(1) neither non-explicit nor ambiguous, its narrow scope does not punish otherwise innocent conduct. Montejo's conduct is otherwise punishable by law whether he knew that

the means of identification in his unlawful possession belongs to someone else or was false altogether. *See* 18 U.S.C. § 1028(a) and (c). In other words, using a means of identification that is not one's own, regardless of whether it belonged to someone else, is not lawful or constitutionally protected. Montejo may not have known that he was using a means of identification that belonged to someone else, but he did know that he was engaged in otherwise unlawful conduct. That is all that is required to relieve the concerns raised by the Supreme Court in *X–Citement Video* and *Staples.* As the United States Court of Appeals for the Fourth Circuit has explained, "the driving force behind the [Supreme] Court's decision in *X–Citement Video* was to read the statute to avoid placing ordinary citizens at risk of criminal prosecution for otherwise innocent conduct." *Langley,* 62 F.3d at 607; *see also id.* at 614 (Phillips, Senior J., concurring and dissenting) ("The interpretive path here is clearly marked. To resolve . . . the intended reach of an express (or implied) mens rea requirement, we have a powerful primary canon of statutory construction. . . . [I]t is the presumption that, unless statutory language or legislative history evinces a contrary intent, a nonspecific mens rea requirement was intended by Congress to run to each of the statutory elements which criminalize otherwise innocent behavior. [internal quotations omitted]."). In the present case, there is no risk that restricting the mens rea requirement to the conduct involved will criminalize—or even chill—otherwise innocent behavior.

Indeed, defendants engaged in otherwise guilty conduct who are subjected to

---

4. The relevant text of 78 Stat. 708, as amended, 7 U.S.C. § 2024(b)(1), as it existed when the Supreme Court interpreted it in *Liparota,* and with emphasis added, read: "[W]hoever

*knowingly* uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [the statute] or the regulations. . . ."

stiffer criminal penalties due to the existence of some fact to which they were not aware at the time of the offense are not entitled to any additional protection through judicial imposition of a scienter requirement where Congress did not impose one. *See X–Citement Video,* 513 U.S. at 72, 115 S.Ct. 464 (*"Morissette,* reinforced by *Staples,* instructs that the presumption in favor a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct.") In *United States v. Feola,* 420 U.S. 671, 682, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), the Supreme Court determined that 18 U.S.C. § 111, a statute meting out enhanced criminal penalties for individuals who assault federal law enforcement officers, did not require that the Government prove that the accused know that the person he assaulted was a law enforcement officer, explaining that:

> This interpretation poses no risk of unfairness to defendants. It is no snare for the unsuspecting. Although the perpetrator of a narcotics "rip-off," such as the one involved here, may be surprised to find that his intended victim is a federal officer in civilian apparel, he nonetheless knows from the very outset that his planned course of conduct is wrongful. The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected. In a case of this kind the offender takes his victim as he finds him.

*Id.* at 685, 95 S.Ct. 1255; *see also Langley* 62 F.3d at 607 (noting that "the reasonable expectations of felons are wholly distinct from the reasonable expectations of ordinary citizens" and therefore a felon in possession of a firearm cannot escape conviction for that crime by virtue of the fact that he was unaware of his felon status). Similarly, a person who unlawfully transfers, possesses, or uses a means of identification that does not belong to him does so at the risk that it belongs to someone else.

This interpretation does not disarm defendants of a defense based on a reasonable mistake of fact. *See United States v. Iron Eyes,* 367 F.3d 781, 784 (8th Cir.2004) ("A defendant's evidence of mistake of fact may cast doubt on whether he or she had the mental state required for the commission of a particular crime."). If an individual possessed a means of identification that he reasonably believed legally belonged to him, which turned out to belong to another person, he could not be convicted under § 1028A(a)(1). In that example, the defendant was engaged in conduct that he otherwise believed was legal: possessing his own means of identification. Thus, if a defendant believed that he was using a means of identification that legally belonged to him, when in fact he was using a means of identification of another person, he would not be subject to conviction under § 1028A(a)(1). In Montejo's case, his mistake of fact was not otherwise innocent: he knew that the means of identification he possessed was fake and that possessing it was illegal. In essence, Montejo's mistake was not one of fact, but rather of law by failing to realize the risks associated with possessing false documents. *See United States v. Fuller,* 162 F.3d 256, 262 (4th Cir.1998) ("While a mistake of fact can provide a defense to an offense that has a mens rea requiring knowledge, a mistake of law ... is no defense because the background presumption must be that 'every citizen knows the law.' *Bryan v. United States,* 524 U.S. 184, 193, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998).").

### 2. Structure

Montejo argues that the structure 18 U.S.C. § 1028A as a whole indicates that the mens rea requirement in § 1028A(a)(1) should be applied to every element of the offense. Section 1028A(a)(2), entitled the

"terrorism offense," which follows the "general" offense, § 1028A(a)(1), at issue in this case, mandates a five-year term of imprisonment for any person who "during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person *or* a false identification document." (Emphasis added). Montejo contends that the fact Congress distinguished between a means of identification of another person and a false identification document indicates that it intended that a person must know the difference between the two. More specifically, he argues that under the terrorism offense, a person could not be convicted for possessing, without lawful authority, an identification document that turns out to be false—the defendant must know it to be false. Likewise, with respect to the general offense, he asserts, a person should therefore not be liable to conviction for possessing a means of identification that turns out to belong to someone else when he believed that it was fake.

The application of the mens rea requirement in § 1028A(a)(2) is not before the Court. It is not altogether clear, nor must this Court decide, whether Montejo's reasoning that a person who possesses an identification document that turns out to be false can be convicted under subsection (a)(2). Either way, however, Montejo has identified a distinction that sheds no light on the mens rea requirement of the general offense in subsection (a)(1). The distinction between the general aggravated identity theft offense and the terrorism offense is simply that those involved in the former are eligible for the enhancement whether they possess an identification document that belongs to someone else or whether it is false. Those involved in a general offense, on the other hand, are only eligible for the enhancement if the means of identification in their unlawful

possession turns out to belong to another person. Thus, the only difference is that the terrorism offense in subsection (a)(2) proscribes more conduct than the general offense.

As will be discussed below, this distinction makes perfect sense. Among the factors motivating Congress to enact § 1028A was evidence that terrorists utilize false means of identification to gain access to secure locations, obtain cover employment, and engage in other illegal activities in support of terrorism. *See infra.* A defendant's knowledge has nothing to do with the difference between the two subsections—the threat of terrorism does. Nothing about the structure of § 1028A as a whole countervails the language in subsection (a)(1).

### 3.  Purpose

Applying the mens rea requirement only to the conduct proscribed by § 1028A, as outlined above, is consistent with Congress' apparent intention, which was "to establish penalties for aggravated identity theft, and for other purposes." Pub. L 108–275, § 2(a). *See 3 Sutherland Statutory Construction* § 47.4 n. 9–10 (6th ed.2004) (noting that "the preamble may be resorted to help discover the intention of the law maker" and further that "the preamble as well as the text of the act, is useful in determining the scope of an act"). That is precisely what § 1028A(a)(1) does: it requires that a mandatory sentence of two years imprisonment be imposed on a person who knowingly transfers, possesses, or uses a means of identification that belongs to someone else, *while committing another enumerated felony.* This mandatory two-year term must be imposed consecutively with whatever sentence is imposed for conviction on the enumerated felony. Nowhere does the statute's purpose, as indicated by the preamble, sug-

gest that the purpose of the enhanced punishment is related to the violator's knowledge. Rather, the preamble indicates that the purpose of the enhanced penalty is to punish the violator's aggravating conduct: the use of another person's means of identification and the commission of a predicate felony enumerated by the statute. Thus, the outcome achieved by the plain language interpretation of the statute is consistent with the intent and policy conveyed by the preamble.

■ This result is further supported by § 1028A's legislative history, as conveyed by the House Report by the Committee on the Judiciary, which can be perused only to the extent necessary to confirm that the ordinary meaning of the statute does not contravene the clearly expressed will of Congress. *But see Rosmer v. Pfizer, Inc.*, 263 F.3d 110, 117 (4th Cir.2001) ("It is 'the statute, and not the Committee report, which is the authoritative expression of the law.' *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 337, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994)."); *United States v. White*, 475 F.2d 1228, 1234–35 (4th Cir. 1973) ("We look to the unambiguous words of the criminal statute to determine its meaning and not to the purported intentions of a congressional committee."). According to the House Report, the purpose of the statute is to "provide[ ] enhanced penalties for persons who steal identities to commit terrorist acts, *immigration violations,* firearms offenses, and other serious crimes." H.R. Rep. 108–528 at 3, 2004 U.S.C.C.A.N. 779, 780 (June 8, 2004) (emphasis added). The House Report explains that "the terms 'identity theft' and 'identity fraud' refer to all types of crimes in which someone wrongfully obtains and uses another person's personal data in some way that involves fraud or deception, typically for economic or other gain, *including immigration benefits.*" *Id.* (emphasis added). The Report also describes the common types of identity theft of-

fenses based on a 2002 report of the Federal Trade Commission:

[F]orty-two percent of complaints involved credit card fraud, 22% involved the activation of a utility in the victim's name, 17% involved bank accounts opened in the victim's name, *9% involved employment fraud, 8% involved government documents* or benefits fraud, 6% involved consumer loans or mortgages obtained in the victim's name, and 16% involved medical, bankruptcy, securities and other miscellaneous fraud.

*Id.* (emphasis added).

Montejo argues that he does not fall within the class of individuals that the statute aims to regulate because he did not intentionally obtain and misappropriate the means of identification of another person. Specifically, he contends that he did not engage in identity *theft* because he did not know that he was utilizing another person's identity, no one was victimized by his conduct, and though he utilized the alien registration and social security numbers of other people, the card containing those numbers also contained his own name, date of birth, and picture. Nonetheless, Montejo's conduct falls directly within the sphere that Congress targeted: individuals who obtain immigration benefits or government documents and persons who engage in employment fraud. Montejo used government documents of other individuals to gain employment and evade immigration laws.

In further support of his position, Montejo also contends that the title of the Act itself indicates that Congress' purpose was to punish "aggravated identity *theft,*" and theft alone. Thus, he argues, any interpretation that allows an individual to be prosecuted and convicted for identity *theft* when that person did not know that he was stealing another person's identity, under-

mines Congress's intent. After all, "[a]t common law, theft was 'the taking of property of another from the possession of the owner with intent to defraud, or the felonious taking and carrying away of the personal property of another with intent to convert it to the use of the taker without the consent of the owner.'" *McLaughlin v. City of Canton, Miss.,* 947 F.Supp. 954, 970 n. 18 (S.D.Miss.1995) (quoting 52A C.J.S. Larceny § 1(2), at 398 (1968)); *see also* Black's Law Dictionary (7th ed.1999) at 1486 (defining theft as "[t]he felonious taking and removing of another's personal property with the intent of depriving the true owner of it; larceny."). Not only does confining the mens rea to the conduct proscribed by § 1028A(a)(1) contravene Congress's express purpose as conveyed by the title of the statute, Montejo argues, it also results in a patently absurd result that renders the statute ambiguous.

Indeed, it is odd—and borders on the absurd—to call what Montejo did "theft." Montejo did not deprive the means of identification from its true owner: he merely used a means of identification he knew to be false with respect to himself in order to gain employment. Thus, it is evident that Montejo is not a thief in the traditional sense of the word. The person who sold Montejo the means of identification may have deprived it from its true owner, but Montejo, based on stipulated facts, did not. However, the mere fact that a particular outcome is absurd does not permit the Court to impose what it views as a more reasonable outcome. Nor does it mean that the outcome necessarily undermines Congress' purpose. As explained above, Congress targeted a class of individuals that Montejo was a part of—namely, those who utilize government documents belonging to others to gain employment and evade immigration laws.

▄▄▄ Furthermore, as a matter of rote statutory interpretation, the word "theft"

appears nowhere in the statutory language itself, but rather is used only in § 1028A's title. Though it serves a descriptive purpose, "the title of a statute cannot limit the plain meaning of the text. For interpretive purposes, [the title] is of use only when it sheds light on some ambiguous word or phrase." *Penn. Dep't of Corrections v. Yeskey,* 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (quotations omitted), *cited in United States v. Buculei,* 262 F.3d 322, 331 (4th Cir.2001). What is more, "[w]hile "theft" is a popular term often identified with "larceny," the word "theft" is an umbrella term which includes other forms of wrongful taking." *McLaughlin,* 947 F.Supp. at 970 n. 18 (citing 52A C.J.S. Larceny § 1(2), at 398 (1968)). Divining why Congress chose to entitle the statute "aggravated identity *theft,*" or what it means by the word "theft," when that word appears nowhere in the statutory text itself, is an exercise in which the Court cannot engage since the plain meaning is clear on its face.

Montejo correctly points out that the conduct that Congress appeared most concerned with when it enacted § 1028A was that of individuals who steal the identities of others for pecuniary gain. *See* H.R. Rep. 108–528 at 5–6, 2004 U.S.C.C.A.N. at 781–82 (illustrating instances where individuals used the identities of others to commit bank fraud, conduct financial transactions in the name of others, submit false tax returns and obtain unlawful refunds, obtain loans and credit lines, and collect government benefits). In each of those instances, the offender acted for pecuniary gain and the individual whose identity was stolen was victimized. Neither case exists here. However, Congress did not make pecuniary gain and victimization elements of the offense. So long as the language and structure of the statute do not countervail the clearly expressed intent of the legislature—to prevent identi-

ty theft and for other purposes—the statute cannot be said to be ambiguous.

### B. The Elements of a General Aggravated Identity Theft Offense

Based on the language, structure, and purpose of 18 U.S.C. § 1028A(a)(1), the plain meaning of the statute is clear and unambiguous: the mens rea requirement of the statute applies only to the conduct involved—transfer, possession, or use—and not to the object of that conduct—the means of identification of another person. Accordingly, to be convicted of aggravated identity theft under § 1028A(a)(1), based on the statutory language itself, the Government must prove that the accused individual: 1) during and in relation to any felony violation enumerated in § 1028A(c), 2) knowingly transfers, knowingly possesses, or knowingly uses, 3) a means of identification of another person, 4) without lawful authority. Based on the Statement of Facts that Montejo, his attorneys, and the attorneys for the Government executed before this Court, *see* Doc. No. 18 (Sept. 23, 2003), the Government has proven the essential elements of the offense. Montejo's conviction must therefore stand.

### C. Additional Arguments

■■■■ Montejo urges this Court to find that the result imposed by this interpretation of § 1028A(a)(1) is absurd and therefore apply the rule of lenity to construe the mens rea as applying to every element of the offense. Aside from his other arguments, Montejo contends that it is absurd to imprison him for two years when there are no victims of his crime, he did not intend harm, and he was unaware that the means of identification he used to gain employment actually belonged to other people. *See Staples,* 511 U.S. at 615, 114 S.Ct. 1793 ("Historically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispens-

ing with mens rea."). As stated above, it is unquestionably odd that a person who did not know that he was using a means of identification of another, whose conduct had not a single victim, and who presented his own name, picture, and birth date to his prospective employer in order to get the job, would have to go to jail for two years. What makes it even more odd is that, upon completing his term in prison, Montejo will be removed back to Mexico. However, the existence of an odd result in a particular case does not render the statute ambiguous. Furthermore, the length of the term of imprisonment is not so facially egregious that it warrants this Court imposing lenity where no ambiguity in the statute exists. The fact remains that Montejo's conduct was otherwise unlawful, which exposes him to the risk of a more severe punishment under some circumstances, even if unknown to him. *See id.* at 618, 114 S.Ct. 1793 (clarifying that, despite the historic rule, only when "dispensing with mens rea would require the defendant to have knowledge [ ] of traditionally lawful conduct, [is] a severe penalty [ ] a further factor tending to suggest that Congress did not intend to eliminate a mens rea requirement").

Finally, the Government alternatively argues that, even if the mens rea requirement of § 1028A(a)(1) permits conviction only if a defendant knows that the means of identification in his unlawful possession belonged to another person, Montejo's conviction should still stand because the scienter of "knowingly" can be satisfied by evidence indicating that a defendant's conduct is "willfully blind" to the truth at hand. *See United States v. Ruhe,* 191 F.3d 376, 384 (4th Cir.1999) (permitting a "willful blindness" instruction to the fact finder, which allows it "to impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place

around him. [internal quotations omitted]"). Providing a willful blindness instruction to the fact finder and convicting a defendant on those grounds, however, is appropriate only in "rare circumstances." *Id.* at 385 (internal quotations omitted). Indeed,

> [a] court can properly find willful blindness only where it can almost be said that the defendant actually knew.... It requires in effect a finding that the defendant intended to cheat the administration of justice. Any wider definition would make the doctrine of willful blindness indistinguishable from the civil doctrine of negligence in not obtaining knowledge.

*Id.* at 384–85 (quoting *United States v. Jewell* 532 F.2d 697, 700 n. 7 (9th Cir. 1976)). Based on the Statement of Facts to which Montejo pled guilty, there simply is not enough evidence to convict him on such a narrow ground. The evidence is insufficient to find that he was willfully blind to the fact that the means of identification belonged to someone else. In fact, there is no evidence whatsoever that Montejo's failure to realize that the means of identification belonged to another person amounted to an attempt to cheat the administration of justice. As the mens rea requirement of § 1028A(a)(1) does not extend to the means of identification, however, the point is irrelevant.

## IV. CONCLUSION AND ORDER

Title 18, United States Code, Section 1028A(a)(1)'s plain meaning makes clear that a person who knowingly transfers, knowingly possesses, or knowingly uses a means of identification that does not belong to him, in the course of committing a felony enumerated by the statute, does so at the risk that the means of identification belonged to someone else, and subjects himself to the enhanced criminal penalties contained therein. Put simply, to be convicted of aggravated identity theft under § 1028A(a)(1), the accused individual need not know that the means of identification in his unlawful possession actually belonged to another person; ignorance of the fact that the means of identification belonged to another person, or mistakenly believing that the means of identification is fake, is not a defense. Congress may not have specifically targeted individuals like Montejo, but it did include them within § 1028A(a)(1)'s long, and legally justifiable, grasp. Suffice it to say that this Opinion gives the undersigned no pleasure, but is promulgated by its duty to follow the laws enacted by Congress.

The Government has proven the essential elements of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) beyond a reasonable doubt. Indeed, Defendant Montejo has so stipulated. Accordingly, Defendant's Motion for Judgment of Acquittal brought pursuant to Federal Rule of Criminal Procedure 29(c)(1) is **DENIED**.

The Clerk of the Court is **DIRECTED** to provide a copy of this Memorandum Opinion and Order to counsel for the Defendant and the United States of America.

**IT IS SO ORDERED.**